478 F.2d 115
 Fed. Sec. L. Rep. P 93,937
Abraham COHEN and Esther Friedlander, Co-Executors of the
Last Will of Raphael Cohen, Deceased, Plaintiffs-Appellants,
v.
FRANCHARD CORPORATION et al., Defendants-Appellees, and
Joseph E. Low et al., Defendants.
 No. 359, Docket 72-1724.
 United States Court of Appeals,
Second Circuit.
 Argued Jan. 17, 1973.
Decided April 11, 1973.
 
 Irving Bizar, New York City (Ira Jay Sands, Barbara P. Sugarman and Demov, Morris, Levin & Shein, New York City, on the brief), for plaintiffs-appellants.
 Roy L. Reardon, New York City (Peter J. Schlesinger and Simpson, Thacher & Bartlett, New York City, on the brief), for defendant-appellee Franchard Corp.
 Irving Parker, New York City (I. Michael Bayda and Jacobs, Persinger & Parker, New York City, on the brief), for defendants-appellees Louis A. Siegel and Seymour Young.
 Before FRIENDLY, Chief Judge, and OAKES and TIMBERS, Circuit Judges.
 TIMBERS, Circuit Judge:
 
 
 1
 This is a striking example of a case that never should have been claimed for jury trial, as plaintiffs' counsel did. That, coupled with what appears to have been a lack of preparation in addition to visibly inept trial conduct on the part of plaintiffs' counsel, is about all that distinguishes this from what otherwise would be an uncomplicated appeal.
 
 
 2
 We cannot emphasize too strongly our disapproval of the dubious judgment of counsel in claiming for jury trial a case involving such issues as "scienter" and "reliance" under the antifraud provisions of the federal securities laws. It is one thing to try such cases before our district judges who have become knowledgeable and experienced in dealing with such difficult problems. But it is quite another thing to expect a jury to comprehend such issues, even assuming an utterly perfect charge.
 
 
 3
 Plaintiffs, representing a class of purchasers of shares in a limited partnership, appeal from a judgment entered on a jury verdict in the Southern District of New York, Lloyd F. MacMahon, District Judge, in favor of defendants Franchard Corporation, Louis A. Siegel and Seymour Young on the issue of liability in a class action brought to recover damages for alleged violations of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) (1970), of Rule 10b-5 promulgated thereunder, 17 C.F.R. Sec. 240.10b-5 (1972), and of Section 352 of the N.Y. General Business Law (McKinney 1968).
 
 
 4
 The chief issue raised on appeal is the propriety of the trial judge's charge to the jury. Subordinate issues are raised with respect to the judge's conduct of the trial.
 
 
 5
 We affirm.
 
 I.
 EVENTS LEADING TO INSTANT LITIGATION
 
 6
 Louis Glickman is a well known real estate syndicator. He was responsible for the creation of the many Glickman enterprises and was founder and first president of the Association of Real Estate Syndicators, Inc. Although not named as a defendant in the instant action, he was involved in the syndicate which is at the center of this action.
 
 
 7
 Franchard Corporation (Franchard) is a New York corporation. It was organized in 1960 for the purpose of taking over the ownership and operation of many properties previously owned and operated by entities in the Glickman organization, as well as real estate syndicates formed by the Glickman organization. It was known as the Glickman Corporation until 1963. The takeover by Franchard was accomplished by the various Glickman enterprises exchanging their holdings and assets for stock in Franchard. Additional Franchard stock was sold to the public. Glickman himself became a principal stockholder, president, and director of Franchard.
 
 
 8
 Wedgwood House Associates (Associates) is a limited partnership syndicate organized under New York law to acquire ownership of two New York City properties-Wedgwood House, a residential apartment building on Fifth Avenue, and land on 34th Street upon which was to be built Warren House, another apartment building. Associates also was to build Warren House.
 
 
 9
 Glickman Corporation of Nevada (Venada) is a Nevada corporation wholly owned by Glickman. It became the net lessee of both Wedgwood and Warren Houses.
 
 
 10
 Louis A. Siegel and Seymour Young, together with Glickman, were the general partners in Associates. Siegel and Young also were senior vice president and vice president, respectively, directors and shareholders of Franchard. They also were officers and directors of Venada.
 
 
 11
 In October 1960, Glickman conceived the idea of syndicating the purchase of Wedgwood House and Warren House. At that time Wedgwood House had almost been completed. The construction of Warren House had not yet begun, the land on which it was to be built not even having been cleared of existing structures. Venada entered into a contract for the purchase of Wedgwood House and the land on which Warren House was to be built. A limited partnership, Associates, was then formed. See N.Y. Partnership Law, Art. 8, Sec. 90 et seq. (McKinney 1948). It consisted of three general partners-Glickman, Siegel, and Young-and an original limited partner, Joseph E. Low.[1] Glickman subscribed to 17 general partnership units, Siegel and Young each subscribed to 1 1/2 general partnership units, and Low subscribed to one limited partnership unit. Each unit represented a capital contribution of $5,000. Thus, the total capital contribution of Glickman, Siegel, Young and Low was $105,000.
 
 
 12
 In order to raise the additional $6,645,000 necessary to assume the Venada purchase contract, to construct the buildings, and to pay all expenses connected with the acquisition and formation of Associates itself, Associates offered to the public units and half-units of limited partnership interests at $5,000 and $2,500 per unit, respectively.[2] The general partners, together with various experts such as architects, engineers, and attorneys, prepared literature to promote the sale of the limited partnership interests in Associates. A flyer and a brochure served as the selling documents from October 1960 to December 31, 1960.
 
 
 13
 On January 1, 1961, Section 352-e of the New York General Business Law became effective. Section 352-e required that, before an offering concerning the syndication of real estate could be made to the public, a "prospectus" or "offering statement" must be filed with the state Attorney General containing specified information. N.Y.Gen.Bus. Law Sec. 352-e(1)(a), (b) (McKinney 1968). It also required that all advertising in connection with the offering be consistent with the information set forth in the prospectus and that all advertising literature be filed with the Attorney General prior to dissemination. Section 352-e(1)(c), (5). To comply with this provision, Associates prepared and filed a new prospectus. This new prospectus and a new flyer served as the selling documents from January 1, 1961 until February 1961, by which time all the units had been sold.
 
 
 14
 The selling documents represented, among other matters, that it was "anticipated" that distributions to partners would amount to an 11% per annum return on their investment;[3] that the two apartment houses were to be operated by Venada as net lessee and not by Associates; that Venada's net lease required it to pay to Associates an amount sufficient to cover the mortgages and taxes on the two properties, plus sufficient funds to make distributions to the partners at the anticipated rate; that Franchard had been engaged to maintain Associates' books and records and to employ independent certified accountants; and that Glickman, Siegel, and Young were officers and directors of Franchard and Venada. The selling documents also set forth the income to be received by Venada from rental of the Associates' buildings, the proposed expenses of operation, and the expected profit. The projections were made "on the basis of the rentals provided in leases already signed by tenants of Wedgwood House, the prevailing rental rates and expenses in substantially comparable buildings, the knowledge and experience of the management and engineering staff of Glickman Corporation of Nevada and other appropriate investigation and analysis." Brochure dated September 12, 1960 at 9; Prospectus dated January 1, 1961 at 11.
 
 
 15
 Beginning January 10, 1961, distributions were paid to the partners of Associates at the rate of 11% per annum on the original capital contributed. Distributions on this basis were made monthly throughout 1961 and 1962. In January 1963, however, Venada defaulted in its obligations under the net lease. In March 1963 it was evicted.
 
 
 16
 Venada's default under the lease can be traced to events beginning in October 1960. At that time, Glickman began secretely 'borrowing" Franchard's funds to cover on a short term basis his personal obligations as well as those of Venada. From October 31, 1960 to December 1960, Venada defaulted in rent payments due to three other Glickman syndications in amount of $296,329. These funds were "borrowed" from Franchard. Franchard then was repaid and a new cycle of borrowing began. Venada also would have defaulted on its first rent payment to Associates, but was able to borrow the necessary funds from Franchard.
 
 
 17
 This "borrowing" continued undiscovered until May 1962. At that time Glickman became unable to cover up the loans because, among other reasons, his holdings in various enterprises declined substantially in value. On May 3 and 4, a meeting of Franchard's board of directors was called to discuss Glickman's questionable use of Franchard's funds. Stringent limitations were imposed on Glickman to insure that he would not engage in any further "borrowing" of Franchard's funds.[4] When it was discovered in December 1962, however, that Glickman had violated his commitments to the board, he was forced to resign as an officer and director of Franchard. He thereafter also resigned as a general partner in Associates.
 
 
 18
 Venada's financial condition worsened so that in February 1963 it filed a petition for an arrangement under Chapter 11 of the Bankruptcy Act. Shortly thereafter it was evicted as net lessee of Wedgwood and Warren Houses.
 
 
 19
 After Venada was evicted, Siegel and Young found a new net lessee that agreed to pay a net rental sufficient in amount to allow, after payment of total expenses, distributions at the rate of 4% per annum on the capital contributed.[5] Finally, in 1968, the properties were sold and $4,562,800 of the sale proceeds was distributed to the partners.
 
 
 20
 Going back to November 1967, appellants Cohen and Friedlander, owners of limited partnership shares in Associates, commenced this class action on behalf of all the limited partners in Associates seeking damages against Franchard, Siegel and Young, among others. The complaint set forth three separate counts. The first count alleged violations of Section 17(a) of the Securities Act of 1933, 15 U.S.C. Sec. 77q(a) (1970),[6] of Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. Sec. 78j(b) (1970), and of Rule 10b-5, 17 C.F.R. Sec. 240.10b-5 (1972). The second count alleged violations of Section 352 of the New York General Business Law (McKinney 1968). The third count, "brought derivatively in the right of and for the benefit of Associates . . . .", alleged common law fraud.[7]
 
 
 21
 Before the case was submitted to the jury, as a result of a conference between court and counsel at the conclusion of the evidence and prior to the charge, there emerged an agreement pursuant to which various allegations of misrepresentations and omissions were abandoned, thus leaving, so far as the issues on this appeal are concerned, only the allegations of paragraphs 8, 9 and 11 of the first count of the complaint (the Section 10(b) and Rule 10b-5 count). Paragraph 8 alleged certain affirmative statements made by Associates in the sales materials. Paragraph 9 alleged that these affirmative statements were false and misleading because of Associates' failure to disclose certain facts described in paragraph 9. Paragraph 11 alleged that the named plaintiffs and members of the class relied upon these false and misleading representations in purchasing partnership shares.[8]
 
 
 22
 Plaintiffs first moved for an order designating the action a class action, consisting of the 1330 purchasers of limited partnership interests. On September 23, 1970, this motion was granted. 51 F.R.D. 167. Although the terms of Judge Tenney's order are not clear from the opinion, it appears from the latter, 51 F.R.D. at 174, that "individual issues such as 'reliance' and the quantum of damages" were to be litigated as to each purchaser, and only the issue of fraud was to be litigated as a class. As will appear in the course of this opinion, however, Judge MacMahon, whether on express consent of the parties or through their inadvertence, proceeded to put the issue of reliance before the jury in the class action.
 
 
 23
 The nine day trial began on April 27, 1972 and concluded on May 10. Only the issue of liability was tried. The court had ruled that if the jury should find in favor of plaintiffs on the issue of liability, the issue of damages would be tried immediately thereafter to the same jury. The jury returned a verdict in favor of defendants Franchard, Siegel and Young on the issue of liability.
 
 II.
 JURY CHARGE
 
 24
 Appellants' chief claim on appeal is that the jury charge was substantially incorrect in several respects with regard to what appellants were required to establish in order to recover on their Rule 10b-5 claim. Specifically, appellants contend that the court erred in charging on the legal principles of scienter and reliance, and in failing to instruct the jury that Franchard was charged with the knowledge of its agents.
 
 
 25
 Appellants did not object to the charge on these issues before the jury retired to consider its verdict as required by Fed.R.Civ.P. 51. Before we may consider the sufficiency of the charge, therefore, we must determine whether what occurred immediately prior to the charge made it unnecessary for appellants to take exceptions or, alternatively, whether we should rule on appellants' claims under the "plain error" rule.
 
 Court's Rulings On Requests To Charge
 
 26
 The events regarding the court's charge to the jury may be briefly summarized. The court ordered that all requests to charge be submitted in advance of trial. This order was substantially complied with by both sides. As the trial neared completion, the court scheduled a robing room conference with counsel on May 8 to consider the requests to charge. The night before the conference, appellants left in the judge's chambers supplemental requests to charge consisting of 14 additional items. The judge did not have an opportunity to study these requests and informed counsel that he intended to reject them. Appellants' counsel assured the court that he "could not and would not make any exception to the Court's charge based on these [supplemental] requests" because they were untimely.
 
 
 27
 In their timely requests to charge submitted in advance of trial, appellants requested the court to charge on the issue of scienter as follows:[9]
 
 
 28
 "Plaintiff's Request to Charge-No. 5
 
 
 29
 Under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, the defendants may be held liable to plaintiff if defendants knew or should have known that one or both of the Wedgwood prospectuses were misleading or if defendants knew of the existence of facts which, if disclosed, would have shown other facts to be misleading, . . .
 
 Plaintiff's Request to Charge-No. 6
 
 30
 You may hold the defendants liable to plaintiff and members of his class if you find defendants made false and misleading statements and omitted to state material facts about the Wedgwood House Association syndication, notwithstanding defendants' claim of ignorance of the falsity of the representations if you find they could have ascertained the true facts by the exercise of the degree of care expected of a reasonably prudent person . . . ."
 
 
 31
 After a full discussion with counsel at the robing room conference, the court declined to charge on the issue of scienter in accordance with requests 5 and 6, or requests 3 and 4.
 
 
 32
 On the issue of reliance, appellants asked (in their request 19) for a charge which would have dispensed with the requirement of actual reliance. The court did not consider this request, since it was one of those submitted late. The requested charge on reliance was not even discussed at the robing room conference. The court proposed, however, to charge reliance in the language of the complaint. Counsel accepted this proposal. Accordingly, the court read to the jury as part of its charge paragraph 11 of the complaint as follows:
 
 
 33
 "Without knowledge of the true facts and in reliance upon the false and misleading representations and statements, plaintiff and members of the class made the purchases [of limited partnership interests in Associates] hereinbefore described."
 
 
 34
 Appellants did not request the court to charge that if Bernard Mann, Franchard's treasurer, had knowledge of material misstatements or omissions, such knowledge should be imputed to Franchard under agency principles.
 
 
 35
 Following the charge, the court asked counsel if they had any exceptions. Appellants' counsel took exception to three matters, none of which has anything to do with the issues raised on appeal.[10]
 
 Reliance and Imputed Knowledge
 
 36
 It is clear that appellants have not preserved for appeal the claims they now seek to raise with respect to reliance and Franchard's imputed knowledge.
 
 
 37
 As to reliance, appellants argue before us that in a case of nondisclosure, as opposed to a case of affirmative misrepresentation, a plaintiff need only show that the facts withheld were material. They urge us to reverse the judgment entered on the verdict in favor of defendants on the ground that the court charged that appellants had to show actual reliance.
 
 
 38
 While appellants' request 19 did ask for a charge which keyed liability to materiality, without a requirement of actual reliance, the court properly refused to consider this request because it was not timely submitted. The charge appellants agreed to accept, based on paragraph 11 of the complaint, instructed the jury in effect that it must find actual reliance before it could return a plaintiffs' verdict. Appellants' prior acquiescence in this portion of the charge, coupled with their failure to object to it as given, precludes them from raising the issue of reliance on appeal. United States v. Heyward-Robinson Co., 430 F.2d 1077, 1083-85 (2 Cir. 1970), cert. denied, 400 U.S. 1021 (1971), and cases cited at 1084; Kane v. American Tankers Corp. of Delaware, 219 F.2d 637, 640 (2 Cir. 1955); Westmoreland Asbestos Co. v. Johns-Manville Corp., 136 F.2d 844 (2 Cir. 1943).
 
 
 39
 As to Franchard's knowledge, appellants contend that the court should have charged the jury that, if they found that Bernard Mann, treasurer of both Franchard and Venada, had knowledge that certain material facts were not being disclosed to the public, such knowledge must be imputed to Franchard according to general agency principles. Since appellants totally failed to request any such instruction, either before or after the charge was given, the issue has not been preserved for appeal. Pauling v. News Syndicate Co., 335 F.2d 659, 668-70 (2 Cir. 1964).
 
 Scienter
 
 40
 Appellants' claims with respect to scienter are on a different footing. In their requests to charge submitted both in advance of trial and at the robing room conference, appellants' counsel indicated substantially the same position they now assert before us, namely, that the jury should have been instructed that defendants might be held liable if the jury found that they had negligently omitted to disclose material facts.
 
 
 41
 We hold, under the circumstances of this case, that appellants' failure to object after the court omitted from its charge an instruction on liability based on defendants' alleged negligent omissions does not preclude appellants from raising the issue on appeal. The purpose of a timely exception at the conclusion of the charge is to inform the trial judge of possible errors so that he may have an opportunity to reconsider his charge and, if necessary, to correct it. The provision of Rule 51 which requires timely exceptions is designed to prevent unnecessary new trials because of errors the judge might have corrected if they had been brought to his attention at the proper time. There is no need for an exception after the charge has been given where, as here, the court had been fully informed in advance of the charge as to appellants' contention and it was clear that further efforts to persuade the court would have been unavailing. Steinhauser v. Hertz Corp., 421 F.2d 1169, 1173 (2 Cir. 1970); Sweeney v. United Feature Syndicate, 129 F.2d 904, 905-06 (2 Cir. 1942); Sessoms v. Union Savings & Trust Co., 338 F.2d 752 (6 Cir. 1964), cert. denied, 382 U.S. 821 (1965). Accordingly, we hold that appellants' claims with respect to scienter have been preserved for appeal. We now turn to this issue on its merits.
 
 
 42
 Appellants' essential claim is that the court should have charged that each of the defendants might be held liable if there were material misstatements or omissions in the sales materials, even though defendants did not have knowledge of these misstatements or omissions. Appellants contend that, since Siegel and Young were promoters of the syndication, they had the opportunity and were under a duty to investigate Venada, Glickman, and any other matters which affected the investment value of Associates. Appellants also argue that Franchard, allegedly "the vortex of the syndication activity", should not be permitted to escape liability on the ground that it did not know that a fraud was being committed. In short, appellants claim that defendants should be held liable for mere negligence in allowing the dissemination of allegedly false and misleading offering materials.
 
 
 43
 The court rejected appellants' request to charge with regard to scienter on this theory. It charged in substance that, in order for appellants to recover against defendants, they had to prove actual knowledge of falsity or reckless disregard for the truth:
 
 
 44
 "Guilty knowledge is the key to your decision in this case. The plaintiffs must establish that the defendant whom you are considering had knowledge and intended to defraud these plaintiffs, or that he acted in reckless disregard for the truth, or that he knowingly used a device, scheme, or artifice to defraud."
 
 
 45
 We uniformly have held that a party cannot be held liable in a private suit for damages under Rule 10b-5 for mere negligent conduct. See, e. g., Chris-Craft Industries, Inc. v. Piper Aircraft Corp., 480 F.2d 341, 363 (2 Cir. 1973), slip op. 4897, 4931 (March 16, 1973) (elements of Rule 10b-5 and Sec. 14(e) causes of action are the same); SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1096 n. 15 (2 Cir. 1972); Shemtob v. Shearson, Hammill & Co., 448 F.2d 442, 445 (2 Cir. 1971). Although it is unnecessary to prove the specific fraudulent intent essential to a claim of common law fraud, it must be established that the defendant was to some extent cognizant of the misstatement or omission. Globus v. Law Research Service, Inc., 418 F.2d 1276, 1290-91 (2 Cir. 1969), cert. denied, 397 U.S. 913 (1970); Heit v. Weitzen, 402 F.2d 909, 913-14 (2 Cir. 1968), cert. denied, 395 U.S. 903 (1969).[11] The standard for determining liability under Rule 10b-5 essentially is whether plaintiff has established that defendant either knew the material facts that were misstated or omitted and should have realized their significance, or failed or refused to ascertain and disclose such facts when they were readily available to him and he had reasonable grounds to believe that they existed. See Chris-Craft Industries, Inc. v. Piper Aircraft Corp., supra, 480 F.2d at 363, slip op. at 4932-33. It is not enough for plaintiff to show that defendant failed to detect certain material facts when he had no reason to suspect their existence.
 
 
 46
 Appellants urge that we adopt a standard that failure to discover material facts when such facts could have been ascertained without inordinate effort is enough to establish a private action under Rule 10b-5, "particularly where fiduciary relationships require attention". We decline the invitation.
 
 
 47
 Accordingly, since the court in substance charged actual knowledge of falsity or reckless disregard for the truth -in language that conveyed the essence of the standard stated above-we hold that its charge on scienter was essentially correct.
 
 Plain Error
 
 48
 But this does not end our inquiry. Our Court and other courts of appeals have recognized an exception to the rule that, absent objection in the district court, an appellate court necessarily is precluded from considering alleged errors in the jury charge. An appellate court on its own initiative may reverse on the ground of plain error in a jury charge that was not objected to when such reversal is necessary to correct a fundamental error or to prevent a miscarriage of justice. Curko v. William Spencer & Son Corp., 294 F.2d 410, 413-14 (2 Cir. 1961); Delancey v. Motichek Towing Service, Inc., 427 F.2d 897, 901 (5 Cir. 1970); Ramsey v. Travelers Ins. Co., 317 F.2d 300, 302 (4 Cir. 1963). Upon our own initiative, therefore, we turn to the question whether the judgment entered on the jury verdict below should be reversed on the ground that the court's charge on reliance and its failure to charge on Franchard's imputed knowledge were plain error.
 
 
 49
 With regard to the issue of reliance, the court charged that appellants could recover only if they could prove that "the omitted fact must have been a substantial factor in plaintiff making a choice as to whether or not to buy." While this "actual reliance" standard finds support in our opinion in List v. Fashion Park, Inc., 340 F.2d 457, 462 (2 Cir.), cert. denied, 382 U.S. 811 (1965), we are aware that in two recent Supreme Court decisions involving fraudulent nondisclosure it was held that proof of actual reliance was not essential to a claim for damages.[12] It therefore is arguable that the court erred with respect to this portion of its charge, and that it should have charged that the knowledge which Mann, the treasurer of Franchard and Venada, had of Venada's distressed financial situation should have been imputed to Franchard. Dawn Donut Co. v. Hart's Food Stores, 267 F.2d 358, 363 (2 Cir. 1959).
 
 
 50
 After careful review of the entire record, however, we are convinced that these alleged errors do not warrant our invoking the plain error rule. In our view, appellants' claims do not demonstrate that a substantial miscarriage of justice has occurred. Granted that the alleged errors relate to important elements in appellants' case, we do not believe that the plain error rule demands that every alleged error, even on a significant aspect of a case, requires reversal despite failure to comply with Rule 51. Troupe v. Chicago, Duluth & Georgian Bay Transit Co., 234 F.2d 253, 260 n. 10 (2 Cir. 1956). See Nimrod v. Sylvester, 369 F.2d 870, 873 (1 Cir. 1966). Intervention by us to correct such questionable errors under the plain error doctrine would undercut the salutary rule that claims must be raised in and ruled upon by the trial court before they are ripe for appellate review. As Professors Wright and Miller have stated, "[i]f there is to be a plain error exception to Rule 51 at all, it should be confined to the exceptional case where the error has seriously affected the fairness, integrity, or public reputation of judicial proceedings." 9 Wright & Miller, Federal Practice and Procedure Sec. 2558, at 675 (1971).
 
 
 51
 Appellants also assert that "[t]he Court ignored the fact that this was a class action and there were other buyers involved as well." As indicated above, it is possible that the terms of the order designating the class eliminated, pursuant to Fed.R.Civ.P. 23(c)(4), the issue of reliance for determination as to the entire class. However, the judge clearly proceeded on the assumption that the issue of reliance was to be decided with the issue of liability, and the record is utterly devoid of any objection or contrary suggestion by trial counsel for appellants.
 
 
 52
 We hold upon the entire record that this is not an appropriate case for exercising our discretionary power to review errors not preserved by proper objection in the trial court.
 
 III.
 CONDUCT OF TRIAL
 
 53
 Appellants' claims regarding the trial judge's conduct of the trial merit only brief mention.
 
 
 54
 Essentially appellants have engaged in a broadside attack upon the judge's rulings on evidence, oral and documentary; his comments to the jury; the "unevenness" of his rulings in favor of defendants; and his creation of prejudice in favor of defendants.
 
 
 55
 Suffice it to say that our careful examination of the entire trial transcript of this nine day trial leaves us with the firm conviction that appellants' claims of misconduct on the part of the judge are wholly without merit.
 
 
 56
 In the first place, the conduct complained of was far from unprovoked. The alleged improper acts strike us as appropriate responses by a conscientious judge in handling difficult situations created largely by the lack of preparation for trial and evasive attitude toward the judge by appellants' counsel.
 
 
 57
 Secondly, our scrutiny of the record discloses that in every instance complainted of the judge was doing his very best to clarify the issues and assist the jury in understanding the evidence in a case which, but for the judge's intervention, could have baffled even the most conscientious jury.
 
 
 58
 Finally, we do not find a single instance of conduct on the part of the judge which in any way prejudiced appellants or displayed the slightest bias toward them.
 
 
 59
 In short, we hold that there is no merit whatsoever in appellants' claims of misconduct on the part of the trial judge, for we can say with fair assurance, "after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error . . . ." Kotteakos v. United States, 328 U.S. 750, 765 (1946); United States v. McCarthy, 473 F.2d 300, 308 (2 Cir. 1972); United States v. Ellis, 461 F.2d 962, 970 (2 Cir.), cert. denied, 409 U.S. 866 (1972).
 
 
 60
 Affirmed.
 
 
 
 [1]
 Low originally was named as a defendant in this action. At the close of plaintiffs' case, however, plaintiffs consented to a dismissal of the complaint against Low
 
 
 [2]
 The issuer of the limited partnership interests, Glickman Servicing, Inc., was a corporation owned by Glickman. It was not named as a defendant in the instant action
 
 
 [3]
 It was disclosed that partnership distributions were to be pro-rated in proportion to original capital contributions. However, 80% of the distributions of the partnership's net cash receipts, as defined in the partnership agreement, in excess of $742,500 in any year was to be prorated among all partners in the same proportion, with the balance going to the general partners
 
 
 [4]
 Franchard also reported the matter to the Securities and Exchange Commission and retained Simon H. Rifkind, Esq. to study the situation and to determine whether Franchard had suffered any loss
 
 
 [5]
 The total distribution to partners in 1961 was $707,104; in 1962, $742,500; in 1963, $225,000; in 1964, $266,600; in 1965, $266,600; in 1966, $267,500; in 1967, $268,400; and in 1968, not including proceeds from sale of the properties, $111,832
 
 
 [6]
 Plaintiffs abandoned the claimed violations of the 1933 Act prior to submission of the case to the jury
 
 
 [7]
 The third count was dropped by plaintiffs prior to trial. In their brief on appeal, plaintiffs do not claim error with respect to the matters alleged in the second count
 
 
 [8]
 In light of the issues raised on appeal and our rulings thereon, we find it unnecessary to discuss any of the allegations of omissions and misrepresentations set forth in the complaint
 
 
 [9]
 In their requests 3 and 4 (also submitted in advance of trial), appellants referred to the issue of scienter, but in a more opaque manner:
 "Plaintiff's Request to Charge-No. 3
 Plaintiff may recover against defendants participating in the acts complained of if you find that said defendants did not adhere to the special duty imposed upon them, based upon their claimed expert knowledge in syndications, not to take advantage of plaintiff's ignorance of the risks involved in the Wedgwood syndication. . . .
 Plaintiff's Request to Charge-No. 4
 If you find that defendants in the sale of Wedgwood securities made false and misleading statements to plaintiff and members of his class and omitted to state material facts, you may hold the defendants liable, even if you find that defendants had an honest belief in the ultimate success of the Wedgwood venture . . . ."
 
 
 [10]
 The three matters to which appellants' counsel excepted were: (1) a date used by the court in its recitation of the facts which counsel claimed was incorrect; (2) the court's reference to named plaintiff Cohen's purchase in 1964 of an additional unit of limited partnership interest in Associates; and (3) whether the charge sufficiently stated that individual purchasers had signed documents claiming that they had relied on the brochure
 
 
 [11]
 See ALI, Federal Securities Code, Sec. 251A, Tentative Draft No. 2 (March 1973), which reads as follows:
 "Sec. 251A. [Knowledge.] When reference is made to this section, a misrepresentation is known by a person to be a misrepresentation if he (a) knows or believes that the matter is otherwise than represented, (b) does not have the confidence in its existence or non-existence that he expresses or implies, or (c) knows that he does not have the basis that he states or implies he has for his belief."
 
 
 [12]
 In Mills v. Electric Auto-Lite Co., 396 U.S. 375, 385 (1970) (Section 14(a)), and Affiliated Ute Citizens v. United States, 406 U.S. 128, 153-54 (1972) (Rule 10b-5), the Supreme Court held that, under the circumstances of those two cases, it was unnecessary to prove actual reliance. It was enough that there were material misrepresentations in solicitation documents which were "an essential link in the accomplishment of the transaction." 396 U.S. at 385. The full implications of those decisions have not yet been determined. See Chris-Craft Industries, Inc. v. Piper Aircraft Co., supra, 480 F.2d at 373, slip op. at 4951-59; Crane Co. v. Westinghouse Air Brake Co., 419 F.2d 787, 796 (2 Cir. 1969), cert. denied, 400 U.S. 822 (1970); Kohn v. American Metal Climax, Inc., 458 F.2d 255, 288-91 (3 Cir.), cert. denied, 409 U.S. 874 (1972). We decline to hold on the present state of the law that it was plain error for the district court in the instant case not to have instructed the jury according to the Mills and Ute formulations
 We also note that several commentators have questioned the application of the List standard in nondisclosure cases. See 6 Loss, Securities Regulation 3879 (2d ed. 1969); 1 Bromberg, Securities Law: Fraud-SEC Rule 10b-5, at 212 (1969); Note, Civil Liability Under Section 10(b) and Rule 10b-5: A Suggestion for Replacing the Doctrine of Privity, 75 Yale L.J. 658, 688 (1965).