**JAMES TALCOTT, INC., Plaintiff,**

v.

**JACK COLE COMPANY, Defendant-Third Party Plaintiff-Appellant,**

v.

**RAPISTAN INCORPORATED, Third Party Defendant-Appellee.**

**No. 29353.**

United States Court of Appeals, Fifth Circuit.

April 8, 1971.

Rehearing Denied May 4, 1971.

John H. Morrow and Warren B. Lightfoot, Bradley, Arant, Rose & White, Birmingham, Ala., for appellant.

Herbert W. Peterson, W. Eugene Rutledge, Birmingham, Ala., for appellee; Rives, Peterson, Pettus, Conway & Burge, Birmingham, Ala., of counsel.

Najjar & Najjar, Birmingham, Ala., for other interested parties.

Before RIVES, WISDOM and GODBOLD, Circuit Judges.

RIVES, Circuit Judge:

Cole, a motor freight carrier, purchased from Rapistan an expensive and complicated conveyor system for handling freight across its dock at its main

terminal in Birmingham, Alabama,[1] and built a new dock wide enough to accommodate the conveyor. The conveyor was installed in a permanent fashion so as in effect to make it a part of the terminal. The cost of installation, $33,350.00, was to be paid directly by Cole to Rapistan. The agreed price of the conveyor system was $168,164.00, secured by a conditional sales contract assigned to Talcott upon Cole's written assurance that it would not assert against Talcott any claim or defense that Cole might have against Rapistan. With the addition of finance charges, the total cost to Cole of the conveyor system installed was $235,500.00 plus the cost of building the new dock.

The initial action brought by Talcott against Cole has resulted in a judgment in favor of Talcott for $102,000.00, the balance of the purchase price. No issue is presented on this appeal as to that initial action, and that action did not involve any of the issues presented by the third party action.

The third party action brought by Cole against Rapistan was three-pronged. First, Cole claimed that on account of Rapistan's breach of express and implied warranties,[2] Cole was entitled to rescind the contract of sale and recover from Rapistan the purchase price of the conveyor system. Second, if rescission was denied, Cole asserted that it was entitled to recover damages caused by Rapistan's breach of warranties.[3] Third, Cole claimed that it was entitled to recover damages because of certain written misrepresentations of fact made by Rapistan in connection with the sale.[4]

On a jury trial, at the close of Cole's evidence, Rapistan also rested, and the district court granted Rapistan's motion for a directed verdict upon holding: (1)

---

1. Cole had some nineteen other terminals located in Illinois, Indiana, Pennsylvania, New York, New Jersey, Georgia and Tennessee.

2. One of the express warranties was for maintenance and service of the equipment for a period of one year from completion of installation. Another covered the good quality of the material, workmanship and correct application of the equipment, component parts and installation. Another claimed warranty was in the form of a representation "that the equipment, *if properly used*, operated and maintained will perform the purchaser's uses and purposes as stated in this proposal." [Emphasis added.] Under the Uniform Sales Act, Tit. 57, § 21, Code of Ala. 1940, there was an implied warranty of fitness for the particular purposes for which the equipment was sold and installed.

3. Under the Uniform Sales Act, Tit. 57, § 75, Code of Ala. 1940, where there is a breach of warranty the buyer at his election may either rescind or recover damages.

4. Misrepresentations of material facts, though innocently made, constitute legal fraud in Alabama. Tit. 7, § 108, Code of Ala. 1940.

The claimed misrepresentations in the contract were:

"A Rapistan truck terminal conveyor system can eliminate confusion, speed the flow of freight through the terminal, increase worker efficiency, and handle a much larger volume with the same or less manpower than is possible with nonconveyorized methods.

"Although freight rates are based on weight of the shipment, the work of the terminal is a function of the number of pieces handled. By speeding the flow of freight through the terminal, a Rapistan conveyor system permits handling a larger volume of freight, or advancing delivery schedules, or both. High-speed truck stripping and freight sorting make the difference.

" * * *

"By maintaining constant work flow and minimizing walking, back-tracking, and manual handling of freight, high speed movement through the terminal is achieved. An average of 800 pieces per hour can be stripped by one man from a trailer, using the Rapistan conveyor system, reducing the average trailer-stripping operation to less than one man-hour of manual labor. All other handling functions easily keep up with this pace.

" * * *

"Paper work requirements are integrated into the total flow system, depending upon the needs of the individual terminal operation. Minimum checking is necessary to maintain control and verify handling accuracy."

that Cole's attempt to rescind was not made within a reasonable time; (2) that adequate notice of Cole's claims for breach of warranty was not given to Rapistan within a reasonable time; and (3) that Cole's claim for misrepresentations was not commenced within the limitation period of one year after Cole knew, or in the exercise of reasonable care should have known, that the representation was false. Tit. 7, § 42, Code of Ala. 1940.

On appeal Cole contends that each of the questions which the district court resolved against Cole as a matter of law was properly for the jury. Essentially on each of Cole's claims, the critical question was what was a reasonable time under all of the circumstances of the case. After carefully reading and considering the entire record, including the exhibits, in connection with the briefs and arguments of the attorneys, while we recognize ample room for differences of opinion and have great respect for the views of the learned district judge, we agree with Cole's contentions that at the close of its evidence each of its claims was properly for the determination of the jury and that the court erred in directing a verdict for Rapistan. Accordingly, we reverse and remand.

Essentially our decision is prompted by the Seventh Amendment mandate to preserve the right of trial by jury in suits at common law; or more specifically by the standard prescribed by this Circuit's en banc decision in Boeing v. Shipman, 1969, 411 F.2d 365, 374, 375:

"On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the nonmover's case—but in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question. However, it is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses."

Since the decision turns on the facts, inferences and circumstances of this particular case, we shall endeavor to be brief, though the complexity of the situation makes brevity difficult if not impossible.

Cole had handled freight across its terminal dock in Birmingham with a manual push cart operation. The dock worker took the freight off a truck, placed it on a four-wheel push cart, kept the freight bill with the freight, pushed the cart across the dock and unloaded the freight into the trailer on which it was to be carried. As far back as 1962 or 1963, its President began considering the advisability of converting to some kind of mechanical, dragline, or conveyor operation. In February 1964, Rapistan studied Cole's operation and submitted a report. Thereafter, the building of a new dock and conversion to a conveyor system was spurred by Cole's acquisition of the business of another carrier, Dixie Highway Express, beginning in 1963 and completed in early 1965. In 1964 and 1965, Cole officials studied operations of terminals of other carriers in Dallas, Texas; Kalamazoo, Michigan; Cleveland, Ohio; and Memphis, Tennessee.

After the Kalamazoo study of a Rapistan conveyor system, a detailed report was prepared of the advantages and disadvantages of converting to a conveyor system. At a meeting in March 1965, Cole furnished to Rapistan the result of a survey it had conducted as to how much "conveyable" and how much "non-conveyable" freight it handled. On May 24, 1965, Rapistan submitted to Cole "our formal Proposal-Contract covering equipment for your Birmingham terminal" for acceptance by Cole on or before August 15, 1965. The contract was accepted by Cole on August 4 and approved by Rapistan on August 6, 1965. Installation was to be completed within 20 weeks, and tune-up thereafter when freight is being received into the system. Installation was completed and the conveyor system went into actual operation about January 4, 1966.

From the date of its installation, the conveyor system was not operated satisfactorily, though in many instances there is a serious question of fact as to whether the responsibility for the faulty or inefficient operation should be charged against the equipment furnished by Rapistan or the personnel furnished by Cole. As early as January 13, 1966, Rapistan began to make adjustments, modifications and repairs to the conveyor system. In its answer to interrogatories Rapistan listed 48 different items of work on the equipment, the last of which was completed on October 22, 1966. Since that time Rapistan's employees have not come back on the premises or made any further repairs. Jack Cole, the then President of Cole, testified however that the troubles with the equipment continued and that throughout the time Cole had the system he continued to communicate with Rapistan; that in the Summer of 1967 he personally talked to some of Rapistan's representatives, but wasn't satisfied with the information they gave him and tried to get in touch with the President of Rapistan but never could reach him. "I left word for him to call and I never did hear from him."

About August 15, 1967, Robert E. Short, an experienced motor freight operator from Minnesota, purchased the corporate stock of Cole, and about August 30, 1967 the Interstate Commerce Commission gave Short the authority to take over temporary control of Jack Cole Company. Within the first two to three weeks of Short's management, he reduced the number of employees in the Birmingham terminal from over 200 to less than half that number with the greatest decrease in personnel on the dock. Short testified that the conveyor system simply was not engineered for the nature of the freight that came in and out of that terminal, and that that should have been apparent to almost anyone.[5] Over Labor Day week-end 1967, Short had all of the moving parts of the conveyor disengaged, leaving standing anything that was permanently affixed to the dock. Short then told Rapistan's representatives that Cole had no further use for the conveyor and wanted them to come and take it. "I even offered to have them come and take it, and leave the matter of what amount was still due and owing subject to a later determination, because it was really, in many ways, costing me money to preserve it, but they would not take it under those conditions." [App. 596, 597.][6] This third party action by Cole against Rapistan was filed on March 25, 1968.

On the merits the issues of fact as to breaches of warranty and as to misrepresentation were clearly for the jury and there has been no holding or contention to the contrary. That substantial issues of fact for the jury on the issue of notice to Rapistan of Cole's claims of breach of

5. Under the *Boeing* rule of favorable inferences to the party opposed to the motion for directed verdict, we take that to mean to any expert such as Rapistan.

6. Under Tuscaloosa Motor Co. v. Cockrell, 1961, 272 Ala. 1, 132 So.2d 742, and under the standards prescribed by *Boeing*, *supra*, whether Short's conduct was a sufficient rescission presented a question of fact for the jury.

warranty were presented is established by the oral testimony and particularly by Cole's letter to Rapistan of July 7, 1966, in which it complained of many inadequacies, including a defect in design of the conveyor system which has never been corrected. Thereafter, in November 1966, Cole made the final payment to Rapistan on the costs of installation. Under the circumstances, however, it was for the jury to say whether Cole's conduct amounted to a waiver of its claims for breach of warranty. Cole was un conditionally bound to make the much larger payments to Talcott for the purchase price of the equipment. Rapistan in good faith, or apparently so, had made repeated efforts to make the conveyor work satisfactorily, and had charged its failure to Cole's responsibility of adequately training its employees to efficiently operate the system. Cole apparently took such admonitions to heart, and repeatedly lectured its employees both orally and by written memorandums. A reasonable and fair-minded juror could believe that Cole did not arrive at good faith division of responsibility for the inadequate performance of the conveyor system until well within one year prior to the filing of the third party complaint.

A strong argument is made as to the reasons and motives of Short for ordering discontinuance of the use of the conveyor system almost immediately after gaining control of Cole. Clearly, those present questions for the jury.

The district judge was most seriously impressed by Cole's delay from October 1966 to Labor Day week-end of 1967 as evidenced by his explanation to the jury:

> "This evidence shows this equipment was purchased in 1965. It started operating in January, 1966. They had trouble along there, but in October, 1966, by that time they had made certain repairs and alterations, and they asked for a check *for a check* for the installation, and that check was sent and no further demand of any kind, and no notice whatever was given; payments were kept up from that

time on through August of the following year." [App. 616.]

That period presents to us also the closest question in this case. We hold, however, that, nonetheless, the question of reasonableness was for the jury. A reasonable juror could have believed that Cole had not waived the claimed serious defect in design of the equipment which it had pointed out and which was never corrected. The credibility of Cole's evidence of verbal complaints during that period was for the jury's determination. The jury could have reasonably believed that Cole was not in good faith satisfied that the inefficient performance of the conveyor was chargeable to Rapistan rather than to Cole's own employees until long after October 1966. The district court erred in granting Rapistan's motion for a directed verdict. The judgment is therefore reversed and the cause remanded.

Reversed and remanded.