The INDUSTRIAL DEVELOPMENT BOARD OF the TOWN OF SECTION, ALABAMA, et al., Plaintiffs-Appellants,

v.

FUQUA INDUSTRIES, INC., et al., Defendants-Appellees.

The INDUSTRIAL DEVELOPMENT BOARD OF the CITY OF FORT PAYNE, ALABAMA, et al., Plaintiffs-Appellants,

v.

FUQUA INDUSTRIES, INC., et al., Defendants-Appellees.

No. 74–2336.

United States Court of Appeals, Fifth Circuit.

Nov. 24, 1975.
Rehearing Denied Feb. 23, 1976.

Robert B. Donworth, Jr., Allen Popple-ton, Birmingham, Ala., for plaintiffs-appellants.

John E. Grenier, Birmingham, Ala., for Fuqua, St. Paul, Marine Ins. & Varco.

S. R. Starnes, Birmingham, Ala., Flavius B. Freeman, Springfield, Mo., for Rock Steel & Dewitt-Newton.

Before WISDOM, SIMPSON and RONEY, Circuit Judges.

WISDOM, Circuit Judge:

In this diversity action the district court directed verdicts against two plaintiffs, The Industrial Development Boards of the Town of Section, Alabama, and the City of Fort Payne, Alabama (Boards), on four counts of a multi-count complaint and directed a verdict against one plaintiff, Phillips-Van Heusen Corporation (Van Heusen), on two counts of its complaint. One of Van Heusen's counts was submitted to the jury, which found for the defendant, Fuqua Industries, Inc. (Fuqua). We affirm the directed verdicts entered against the Boards, but we remand for a new trial most of Van Heusen's claims.

## THE FACTS

Varco Steel, Inc. (Varco) agreed to construct for each Board a prefabricated factory building on land owned by the Boards. Each Board had leased the premises to Van Heusen at a rental calculated to liquidate the Board's debt on bond issues that raised the funds necessary for the construction projects. The alleged failure of Varco to construct these buildings in accordance with the contract plans and specifications generated the plaintiffs' suits.

In the late 1950's Van Heusen decided to change from the bar-joist structures it had been using for shirt factories to preengineered factories. Van Heusen chose Varco to construct the new type of building. Van Heusen was satisfied with the work on this plant and engaged Varco to build two others of the same type. The Van Heusen production schedule was then growing at a pace requiring a new plant to be constructed every year. As a consequence, in 1964 Van Heusen began negotiations with Varco for the construction of the two factories involved in this case. On March 9, 1965, Van Heusen and the Varco group (Varco and its subcontractors) reached a tentative agreement on the price of the two factories.[1]

The Boards had already signed lease agreements with Van Heusen. On March 29, 1965, the Boards and Varco entered into a contract for the construction of the preengineered buildings. The contract price was $450,386 for the Fort Payne structure and $248,889 for the Section structure. Fuqua, who became the successor to Varco's contractual obligations through various mergers, admits in its brief, and there was testimony supporting this admission, that the Boards "did not have a nickel in the buildings" and that "Van Heusen's only reason for using the [B]oards was the cheaper borrowing costs". When the construction of

1. These agreements were the basis for Count I of the original complaint, an action against the subcontractors. The district court entered a directed verdict against the plaintiffs on this Count at the conclusion of the plaintiffs' case. This aspect of the case is not at issue in this appeal.

the Fort Payne building was more than one-half completed, Golden, an executive of Van Heusen, noticed that steel purlins [2] in the structure appeared to be twisted. Concerned for the safety of the building, Golden and Howard, Chairman of the Fort Payne Board, sought assurances from Varco and its subcontractors that the steel was satisfactory for the purposes for which it was intended. Varco officials then wrote two letters ("certifications", Van Heusen characterizes them) assuring Van Heusen that the steel work in both factories was in good condition in all respects. Toward the end of 1965 the buildings were completed and accepted by the respective Boards, Van Heusen, and Van Heusen's architect, Holman.

In 1970, Van Heusen employed a new architect, Morgan, to inspect the two factories. Because of the twisted condition of the purlins and various other alleged defects, Morgan requested Varco to furnish the calculations of the engineers showing the load bearing capacity of the steel structures in the two factories. Morgan's dissatisfaction with these calculations caused Van Heusen to engage other contractors to repair the buildings at a total cost of $513,191.86. To recover this sum, Van Heusen and the Boards sued Fuqua, two subcontractors (Rock Steel Building Co. & DeWitt Newton, Inc.), and the surety on Varco's contract (St. Paul Fire & Marine Insurance Company).

Neither of the Boards had expended any money for the repair of the factories. Indeed, Van Heusen signed an agreement with each of the Boards in which Van Heusen agreed to make the repairs it felt were necessary, and to indemnify the Boards for any costs resulting from the repairs or any legal action Van Heusen intended to prosecute against the contracting parties.

In this appeal we concern ourselves with four counts. (1) Count II was based directly on the March 29, 1965, contract. (2) Count III was based on the surety's contract. (3) Count IV was based on the two letters ("certifications") that Van Heusen received from Varco. This count rests on the theory that these certifications constitute warranties, which relieve Van Heusen's original architect of the responsibility for designing the steel. (4) Count V sounds in fraud and deceit. The plaintiff contends that at the time Varco entered into the contract with the Boards it had no intention of complying with the contract specifications.

The directed verdict against the Boards on Counts II and III were entered because the Boards had failed to adduce any evidence showing that they had been damaged by the alleged failure of the defendants to complete the contract according to specifications.

The directed verdict against the Boards and Van Heusen on Count IV was entered apparently because the district court felt that there was no evidence that the certifications had been given for any consideration and because it did not appear to the district court that the certifications gave the plaintiffs any rights which they did not have under the main contract. The directed verdicts against the Boards and Van Heusen on Count V were entered because the district court found no evidence of any fraudulent intention on the part of the defendants and because the claims had expired under the statute of limitations.

The only issue that went to the jury with which this appeal is concerned [3] was whether Van Heusen, as a third-party beneficiary to the March 29 contract between the Boards and Varco, had suffered any damages as a result of the failure of the defendants to comply with

---

2. A "purlin" "[i]n roofs, is a horizontal member supported on the principals and supporting the common rafters of a roof." Webster's New International Dictionary (Second Edition).

3. A third-party claim, in which Varco sought indemnification by its subcontractors for any damages owed to the plaintiffs, also went to the jury. Because of its findings in the principal action, the jury did not have to decide the question of indemnification.

contract provisions. On this appeal, Van Heusen contends that the trial court erred in requiring, as a condition to recovery, that the jury find that Van Heusen was a third-party beneficiary under the March 29 contract. Van Heusen argues that, by virtue of its agreements indemnifying the Boards for any expenses related to this matter and for its payment of the full cost of repair, it was subrogated to the Board's position with respect to the defendants. In the alternative, Van Heusen contends that it has standing to sue on the ground that it is the assignee of the Board's causes of action against the defendants, and that simply as the lessee of the factories it has standing to sue. The appellants further contend that even if no damages were proved by the Boards, their right to proceed for nominal damages was erroneously limited by the directed verdicts against them on Counts II and III. Van Heusen asserts that its position was jeopardized when the Boards were removed from the case. The Boards and Van Heusen contend that the directed verdicts on Count IV were erroneous, because consideration is unnecessary under the relevant law and because the certificates indicate that Varco was assuming or had assumed responsibilities with respect to the design of the factories that, according to the original contract, were to be fulfilled by Van Heusen's architect, Holman. Finally, the Boards and Van Heusen argue that there was sufficient evidence of fraudulent intention and of concealment of the fraud to send Count V to the jury.

## THE BOARDS

■ In view of Van Heusen's having put the factories in an acceptable condition, the Boards suffered no monetary loss from the defendants' alleged faulty construction of the two factories. Since the Boards spent nothing for the repair work, they cannot recover damages against these defendants based upon the cost of repairing the structures.

■ The Boards' contention that they were entitled to a judgment awarding them nominal damages, if in fact a contract to which they were a party had been breached, does not persuade us to reverse the directed verdict. To be sure, Alabama courts have often remarked that a party to a contract that has been breached may be awarded nominal damages. See, e. g., Treadwell v. Tillis, 1896, 108 Ala. 262, 18 So. 886; Gooden v. Moses, 1893, 99 Ala. 230, 13 So. 765, 767. But the Alabama courts have been equally clear that the failure to award nominal damages cannot be the basis of a reversal unless the plaintiff, along with the recovery of nominal damages, would be awarded the costs of litigation from the losing defendant. See Coker v. Louisville & N. R. Co., 1944, 245 Ala. 545, 18 So.2d 84; Blackburn v. Alabama Great Southern R. Co., 1905, 143 Ala. 346, 39 So. 345, 346; New Orleans, M. & T.R.R. v. Southern & Atlantic Tel. Co., 1875, 53 Ala. 211, 221–22. The court in Blackburn observed that "nominal damages are not compensatory, and the refusal to award them deprives the party entitled to them of no property right." 39 So. at 346. Van Heusen has indemnified the Boards for all expenses of litigation. There is, therefore, no interest which could be vindicated by the award of nominal damages in favor of the Boards.[4] We note, in passing, that federal courts have consistently refused to reverse a trial court determination on

---

4. But see Wilson & Co. v. Clark, 1953, 259 Ala. 619, 67 So.2d 898, which suggests that a new trial solely for the purpose of awarding nominal damages would be appropriate. A directed verdict for the defendant was reversed because the jury could have found that the defendant's agent had authority to enter into a contract with the plaintiff. The defendant sought to uphold the directed verdict on the ground that the plaintiff failed to prove damages capable of reasonable ascertainment. In rejecting this argument, the Supreme Court of Alabama said that even if there had been no proof of actual damage, the plaintiff would have been entitled to nominal damages. 67 So.2d at 901. The court did not indicate, however, whether the plaintiff would recover the costs of litigation, nor did it cite the Alabama cases referred to in text.

the ground that nominal damages should have been awarded. *See Peyton v. Railway Express Agency,* 5 Cir. 1947, 158 F.2d 671, 673, *cert. denied,* 330 U.S. 846, 67 S.Ct. 1083, 91 L.Ed. 1290; *Schaeper v. Edwards,* 6 Cir. 1962, 306 F.2d 175, 179; *Brown v. Coates,* 1958, 102 U.S.App.D.C. 300, 253 F.2d 36; *United States v. Withers,* 2 Cir. 1904, 130 F. 696, 698.

Because of the correctness of the directed verdict against the Boards on Counts II and III for failure to adduce evidence of damage, it is unnecessary to consider the directed verdicts on Counts IV and V with respect to the Boards. Since they cannot claim to have been injured, their claims based on the certifications and the alleged fraud are likewise unmeritorious. We will, however, return to these causes of action after discussing the crux of the issue before us—the standing of Van Heusen to assert the claims of the Boards.

## VAN HEUSEN

The confusion of the plaintiffs' counsel in this case is apparent, yet understandable. They had brought before the district court the lessor and the lessee of the premises on which the defendants had promised to construct the buildings. The lessors were removed from the case by the directed verdict against them, and Van Heusen was required to carry its case to the jury without any instruction suggesting that Van Heusen had acquired by law the original rights of the

Boards. We hold that as a matter of law Van Heusen was subrogated to the original cause of action possessed by the Boards, and that it was error for the district court to instruct the jury that, before they could find for Van Heusen, the jury had to be convinced that Van Heusen was an intended beneficiary of the March 29 contract.

## I

## SUBROGATION

■ Before we reach the issue whether Van Heusen, by its conduct of the litigation, lost its chance to argue that it was subrogated to the Boards' rights on the contracts, we must first determine whether the claim of subrogation is in fact correct according to Alabama law. The starting place for this analysis is the Restatement of Restitution § 162, which declares that:

> Where property of one person is used in discharging an obligation owed by another . . . , under such circumstances that the other would be unjustly enriched by the retention of the benefit thus conferred, the former is entitled to be subrogated to the position of the obligee. . . .

Although Comment b to this section of the Restatement points out that if a person makes an "officious" payment that person is not entitled to reimbursement, it excludes from its definition of "officious" a payment made to protect an interest of the payor.[5] The Alabama

---

**5.** The discussion of subrogation and the defense of "intermeddling" in D. Dobbs, Remedies §§ 4.3, 4.9 (1973) is extremely helpful in our understanding of the problems presented by this case. Dobbs first points out that "subrogation is . . . a remedy invoked by courts—originally equity courts—to prevent unjust enrichment, and for this purpose it is appropriate in any case where restitution is warranted and the remedy can be given without working an injustice." *Id.* § 4.3, at 251. Van Heusen's remedy of subrogation is indeed restitutionary. It paid money which relieved Fuqua of a claim that otherwise could have been prosecuted against Fuqua and to the extent of that relief "enriched" Fuqua. If Varco did fail in its contractual obligations, the retention of this enrichment by Fuqua is unjust and

Van Heusen is entitled to its restitutionary remedy.

Dobbs then explains that the purpose of denying restitution to a volunteer or an intermeddler properly serves either one of two principles: (1) that there is no injustice in retaining a completed gift, or (2) that one who confers a benefit on another without giving the other an opportunity to reject that benefit cannot claim restitutionary relief. (The classic example of such a volunteer is a person who paints the house of another with no reason to believe that the other desires this service. The volunteer, having deprived the owner of the decision with respect to painting or not painting, is not entitled to relief.) *Id.* § 4.9, at 299. Clearly neither of these princi-

cases cited to us by the appellants, *Carter v. Carter,* 1949, 251 Ala. 598, 38 So.2d 557; *Dothan Grocery Co. v. Dowling,* 1920, 204 Ala. 224, 85 So. 498, support the Restatement. These cases involved vendees of land purchased under warranty deeds. When it appeared that the property was encumbered by an existing lien, and the vendee paid the lienor the sum owed by the vendor to protect the vendee's interest in the land, the vendee in each case was subrogated to the lienor's position against the vendor.

■■ In this case, Van Heusen's contention is that by paying the full cost of repairing the factories according to the contract stipulations, it has in effect paid a debt owed by Fuqua to the Boards. Having paid such debt, Van Heusen contends that it is entitled to the traditional equitable protection of subrogation. Although we have found no Alabama cases dealing with the lessee's entitlement to subrogation, the parallel between a vendee and a lessee strongly suggests that Alabama courts would allow the equitable result Van Heusen demands.[6]

ples should dictate the result of this case. Van Heusen, in paying for the repair of the factories, did not intend to confer upon Fuqua a gift. Nor was there any significant choice of which Fuqua was deprived such that the second principle could apply. Dobbs explains that a person who supplies necessaries to an infant is entitled to be compensated for their value by the parent. This does not violate the tenet that a volunteer cannot recover in restitution, because the parent had "no choice—legally speaking—of leaving . . . the children to starve . . . ." *Id.* at 304. If the Boards' claims were originally good against Fuqua, Fuqua was not deprived of any significant choice merely for the fact that Van Heusen, and not the Boards, now holds the right to sue.

6. The series of cases in which the City of Birmingham was held not to be entitled to subrogation against tortfeasors who had harmed city employees, for damages arising from the city's payment of sick leave benefits to those employees, is not contrary to our holding here. *See City of Birmingham v. Trammell,* 1958, 267 Ala. 245, 101 So.2d 259; *City of Birmingham v. Walker,* 1958, 267 Ala. 150, 101 So.2d 250. In *Trammell,* the court simply held that since the city was independently liable for the disability payments under Alabama law, the statutory right to subrogation upon which that claim had to be based was inapplicable. The statute, Code of Alabama, Tit. 9, §§ 78, 87 (1940), gave a right to subrogation to a surety who paid a debt primarily owed by his principal. Because subrogation was not available at law until that statute was passed, compliance with the statute was mandatory. In *Walker,* the court, apparently not being bound by the subrogation statute, examined in greater depth the availability of subrogation to an insurer who pays an insured upon a life or accident policy, as opposed to an insurer who pays the value of damaged property. The court held that the former type of insurer (and the City by analogy) would not be entitled to subrogation even though the latter type would. The

basis of this distinction was that there could be no true indemnity for a bodily injury, that the right of the insured (against the tortfeasor) was not determinable by any definite rule.

Our decision in the instant case is not affected by either *Trammell* or *Walker.* As the distinction between law and equity in federal courts is essentially eliminated by F.R.Civ.P. 2 ("[t]here shall be one form of action"), Van Heusen is not bound to the Alabama statute as was the City of Birmingham in *Trammell.* And because the rights involved in Van Heusen's claim are property rights and not rights deriving from personal injury, *Walker* by its own reasoning does not apply.

The language of at least one other Alabama subrogation case implies that a party, in order to be entitled to subrogation, must have been secondarily liable to the creditor it paid. *See, e. g., Duke v. Kilpatrick,* 1935, 231 Ala. 51, 163 So. 640. Thus, where the vendee assumed a mortgage rather than took subject to it, he was not entitled to subrogation to the mortgagee's original rights against the vendor. *Id.* In this case, because Van Heusen had no obligation to the Boards to reconstruct the factories in accordance with the contract, it might be thought that Van Heusen, not being "secondarily liable", is not entitled to subrogation. But the language of *Duke* merely holds that where a party has promised to pay an amount, not as surety for another, but for his own account, that party is not entitled to subrogation. *Cf. City of Birmingham v. Trammell,* 1958, 267 Ala. 245, 101 So.2d 259, *discussed supra. Duke* is, therefore, not really a limitation on the type of interest that a party must have before that party can be entitled to subrogation. *See, e. g., Des Portes v. Hall,* 1940, 238 Ala. 641, 192 So. 899, in which the court held that a wife who made all of the payments on the land purchase contract entered into by her husband was entitled to be subrogated to the vendor's lien on the land as against general contract creditors of the husband. The court held that the wife's interest in preserving

The general principle appears to be that:

> The extent or quantity of [a] subrogee's interest which is in jeopardy is not material. If he has any palpable interest which will be protected by the extinguishment of the debt, he may pay the debt and be entitled to hold and enforce it just as the creditor could.

73 Am.Jur.2d § 25, at 615. A number of cases have in fact held that a lessee does have sufficient interest in property to merit subrogation in proper cases. *See Leno v. Prudential Ins. Co.,* 1948, 228 N.C. 501, 46 S.E.2d 471, 1 A.L.R.2d 281 *and* cases cited therein; *Reid v. Reid,* 1959, 219 Or. 500, 348 P.2d 29.

The case of *Cargill, Inc. v. Great American Ins. Co.,* La.Ct.App.1960, 126 So.2d 368, is similar in important respects to the case before us. There the plaintiff-vendee of certain tanks sued the insurer of a contractor whose negligence resulted in damage to the tanks. The vendor joined in the action. Because the vendee had in fact paid for the repair of the tanks, the court agreed with the defendant's contention that the vendor had suffered no damage and therefore had no right of action. 126 So.2d at 371. The court refused, however, to accept the defendant's "ingenious" argument that because the title to the tank at the time of injury to it was still in the vendor the vendee could not be subrogated to the vendor's cause of action. Instead, when the vendee was "exercising all of the elements of ownership," it was incorrect to apply the doctrine that a volunteer or intermeddler without any duty to pay a debt is not entitled to subrogation. 126 So.2d at 372. To be sure, *Cargill* was a Louisiana case, but the court, in its application of the doctrine of subrogation, appeared to be applying general equitable principles and cited common law authorities.[7]

In *Ohmer v. Boyer,* 1890, 89 Ala. 273, 280, 7 So. 663, 664, the Alabama court

held that a life tenant was entitled to subrogation when she paid off a debt of her grantor secured by the property. The question the court posed for itself was whether "the creature of equity [was] designed for the promotion of justice." It appears to us that to promote justice the Alabama courts would recognize a lessee's subrogation claim on facts such as were before the district court.

## II

## POSSIBLE FORFEITURE OF RIGHTS BY VAN HEUSEN

In its brief before this Court, Fuqua has taken the position that, contrary to Van Heusen's contention, the status of third-party beneficiary was not foisted upon Van Heusen but was in fact adopted by Van Heusen from the very outset of the litigation. Fuqua does not argue that Van Heusen might not have been entitled to subrogation if that had been claimed originally, nor does it argue that there were any equitable defenses which it might have presented had Van Heusen more clearly laid its subrogation theory before the district court. Therefore, we need not speculate whether any equitable defenses exist. Instead, whether there was reversible error in the trial court's handling of the case turns solely on the propriety of reversing a district court on a theory which may not have been fully argued before it.

Before discussing the applicable law, we shall endeavor to trace the issue of Van Heusen's standing to sue through the course of the litigation.

Fuqua points out in its brief that the complaint indicates that Van Heusen intended to rely on a third-party beneficiary status. Fuqua quotes from the complaint

> 1.18 At the time of the execution and delivery of the March 9 Contract it was known to Rock Steel and to New-

---

her dower rights and the homestead rights of herself and her children was a sufficient basis for the subrogation. In *Des Portes* it cannot be said that the wife was "secondarily liable" to the vendor on her husband's contract.

7. An Alabama court has observed that "subrogation is not a common law doctrine but was adopted from the civil law". *Continental Bank & Trust Co. v. Alabama General Ins. Co.,* 1963, 274 Ala. 622, 150 So.2d 688, 689–90.

ton that the Fort Payne and Section buildings contemplated by the March 9 Contract were intended by Van Heusen to be leased by Van Heusen from the Fort Payne Board and from the Section Board, respectively, for use by Van Heusen as shirt factories.

. . . . .

1.20 It was known to Varco before its execution and delivery of the March 29 Section Contract that the Section Varco Contract plant was intended by the Section Board and by Van Heusen to be leased by the Section Board to Van Heusen for use as a shirt factory.

■ Van Heusen's complaint also clearly states, however, that "Varco's failure to perform the March 29 . . . Contract has caused the plaintiffs to incur damages . . .." Under the liberal pleading standard required by the federal rules, the complaint here would seem to encompass relief based on any suitable theory. *See Anderson v. Moorer*, 5 Cir. 1967, 372 F.2d 747, 749; *Dioguardi v. Durning*, 2 Cir. 1944, 139 F.2d 774; *Nagler v. Admiral Corp.*, 2 Cir. 1957, 248 F.2d 319, 322–24, 327. It is certain, at any rate, that the complaint does not limit Van Heusen's theory of relief to recovery as a third-party beneficiary. Van Heusen points out that "the term 'third party beneficiary' does not appear anywhere in any complaint or in any pretrial order". Instead of relying on a third-party beneficiary theory, Van Heusen contends that the provisions of the complaint referring to the lease were included because it was "desirable to allege that the parties charged with constructing these buildings knew the purposes for which the buildings were intended". *Id.* The explanation seems reasonable, but we find it unnecessary to decide what exactly was intended or un-

intended in the complaint. The complaint in this case was sufficiently broad to include relief on a theory of subrogation.

If it cannot be said that Van Heusen in its pleading had foregone a right to relief on a particular theory, it likewise cannot be said that the defendants, in their pleadings and arguments, assented to Van Heusen's standing to sue. Both pretrial orders entered by the district court considered that the "right on the part of Phillips-Van Heusen to sue for . . . breach" was an "issue . . . and controvers[y]". Although the issue of Van Heusen's standing was, therefore, joined in the pretrial stage of litigation, the trial itself was largely devoid of any evidence directly pertaining to this issue.[8] The problem of Van Heusen's standing arose again late in the trial, out of the presence of the jury, in a colloquy between the district court and counsel on the motions for directed verdicts that were made on behalf of all defendants at the close of the plaintiffs' case. We rely heavily on the record here, because we feel that overturning a jury verdict on a legal theory which was not actively argued before the district court turns largely on what was said in open court.

Counsel for Fuqua began by offering the strained argument that, because it did not appear from the record that the Boards were required by any agreement with Varco to lease the factory buildings to Van Heusen, it could not be said that there was any intention on the part of Varco to benefit Van Heusen by the March 29 contract. In rejecting this argument for a directed verdict, the court below correctly indicated that "there's at least been a jury issue made on that". The court felt that there had been sufficient argument of this point, but counsel

---

8. As we mentioned, there was evidence of a continued course of dealing between Varco and Van Heusen over the construction of factories for Van Heusen's use. This is relevant to the question whether, when it entered into an agreement with the Boards, Varco intended that such contract benefit Van Heusen. But the record demonstrates that Varco's inten-

tions at the time it signed the contract with the Boards was not at issue. Instead, the trial dealt mainly with other problems of the case, namely, whether there were in fact specifications which could have been varied from, and, if so, whether the factories were constructed according to such specifications.

for Van Heusen insisted on continuing as follows:

[Y]ou have to admire Mr. Grenier's argument for its completeness. He says you charge out the Board because it hadn't been damaged and you charge out Van Heusen because it wasn't on the contract and it doesn't have any rights as lessee, the result is we've got a gift tax of some kind to pay on the forgiveness to Varco. It cannot be that the arrangements between Van Heusen and the Boards amount to a forgiveness to a third party, Varco, of damages suffered because of the errors in the construction of these buildings.

. . . . .

It seemed to me that I should bring before the Court all the people who were interested as owners of the reversion and of the lease hold in these two buildings. . . .

Rule 20 [9] of the Federal Rules permits joinder of plaintiffs and joinders of defendants and the final sentence of Rule 20 says, in effect, that where there are things to be sorted out that judgments shall be given for the different plaintiffs according to their interests. That rule establishes our right to have these two sets of plaintiffs in each case.

. . . I think that any verdict for compensatory damages should be for the plaintiffs Board and Van Heusen in effect as their interests may appear, which the Court can sort out under the last sentence of Rule 20.

. . .

It is clear that counsel for Van Heusen was arguing that if the Boards could not sue because they have suffered merely nominal damages, Van Heusen would be entitled to sue. The district court's response was not directed toward this contention, however, but merely reaffirmed its feeling that the Boards could not sue for damages when they had suffered none. The response of Van Heusen's counsel was significant:

[T]o the extent that defendant's Exhibit 30 being the indemnity understandings, reflect that Van Heusen has come to be prosecuting a claim that could have been prosecuted by the Board, then depending on how the amount of any damage were worked out, you may have a situation where *Van Heusen is a partial assignee or a partial subrogee and the Board remains as the other partial assignor or partial subrogor.* . . . Under Rule 17–a [10] relating to real parties in interest, a *subrogee has standing to sue.* Now both of those parties are proper parties in the case. . . . (Emphasis added.)

The district court's response again indicates that it was concerned solely with the Boards' standing in the case; the court, with all due respect, did not fully comprehend the import of counsel's argument, or counsel for Van Heusen was not as insistent as he might have been in communicating with the court. The argument did partly involve the question whether Van Heusen's obligations under the lease were the reason for the Boards' having suffered no damages. But Van Heusen's counsel once again turned the course of the argument toward Van Heusen's rights on a subrogation theory. Counsel contended that

9. Rule 20(a) of the Federal Rules of Civil Procedure provides, in pertinent part:

Permissive Joinder. All persons may join in one action as plaintiffs if they assert any right to relief jointly, severally, or in the alternative in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any question of law or fact common to all these persons will arise in the action. . . . A plaintiff or defendant need not be interested in obtaining or defending against all the relief demanded. Judgment may be given for one or more of the plaintiffs according to their respective rights to relief, and against one or more defendants according to their respective liabilities.

10. The first sentence of Rule 17(a) of the Federal Rules of Civil Procedure states that "[e]very action shall be prosecuted in the name of the real party in interest".

[T]here is a subrogation aspect in a way, or an assignment aspect that flows both ways between Van Heusen and the Board. . . .

. . . . .

I think that whatever the situations are between the Board and Van Heusen that is a matter for the Board and Van Heusen and I see that Varco can get no benefit from it. There is nothing in this record anywhere to suggest that by the execution and delivery of any documents between the Board and Van Heusen that there was an intention or even the contemplation of the remotest possibility that Varco would thereby be benefited. . . .

At this point the court observed that there had better be in the record evidence that "at the time Varco and the Board entered into contracts, there was an intention to benefit Van Heusen". The response of Van Heusen's counsel was "yes, sir, we'll stipulate to that and let's stop this argument right now, shall we". There the argument stopped.

The appellees in their brief contend that this stipulation is further proof that Van Heusen was relying on a third-party beneficiary theory. This contention is not supported by close examination of the record. The stipulation of Van Heusen's counsel was only that there was evidence in the record of an intention to benefit Van Heusen. It cannot be said in any way to have limited Van Heusen to a third-party beneficiary theory. This is evident in light of the context in which that stipulation was made, a context which demonstrates that Van Heusen was arguing that it was subrogated to whatever claims the Boards may have had against Varco. Van Heusen's position was, at least at this point of the trial, that it intended to rely on whatever legal theory it could.

It does not appear, however, that Van Heusen continued to press its subrogation claim throughout the litigation, for the court instructed the jury only on the third-party beneficiary theory and Van Heusen did not object to this aspect of the court's instruction.

■ Federal Rule of Civil Procedure 51 states that

No party may assign as error the giving of the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

Thus, it is commonly held that "[i]n the absence of a properly specific objection . . . a party cannot ordinarily claim error in the giving of an erroneous instruction . . .". C. Wright & A. Miller, Federal Practice and Procedure § 2553, at 639; *Little v. Green*, 5 Cir. 1970, 428 F.2d 1061, 1070, *cert. denied*, 400 U.S. 964, 91 S.Ct. 366, 27 L.Ed.2d 384; *Nowell v. Dick*, 5 Cir. 1969, 413 F.2d 1204. The *Nowell* court recognized, however, that "an appellate court will notice an error so fundamental as to result in a miscarriage of justice, [although] . . . the power will only be exercised in exceptional cases . . .". 413 F.2d at 1211. If it can be said, therefore, that the district court's failure to recognize the gist of Van Heusen's subrogation theory amounts to a miscarriage of justice, this Court on appeal will grant relief despite a failure to object at the trial level.

■ We are of the opinion that the district court's failure in this case did constitute a miscarriage of justice. We discuss this in more detail below. There is, however, an alternative ground for reversing the district court. "The failure to object [to jury instructions] may be disregarded if the party's position has previously been clearly made to the court and it is plain that a further objection would be unavailing." C. Wright & A. Miller, *supra*, at 639–40; *see Cohen v. Franchard Corp.*, 2 Cir. 1973, 478 F.2d 115, *cert. denied*, 414 U.S. 857, 94 S.Ct. 161, 38 L.Ed.2d 106; *Krock v. Electric Motor & Repair Co.*, 1 Cir. 1964, 327 F.2d 213, 215, *cert. denied*, 377 U.S. 934, 84 S.Ct. 1338, 12 L.Ed.2d 298; *Hasselbrink*

*v. Speelman,* 6 Cir. 1957, 246 F.2d 34, 39; *Sweeney v. United Feature Syndicate, Inc.,* 2 Cir. 1942, 129 F.2d 904.

The purpose of Rule 51 is to "prevent unnecessary new trials because of errors the judge might have corrected if they had been brought to his attention at the proper time". *Cohen v. Franchard Corp.,* 478 F.2d at 122. Only when the appellate court is sure that the trial court was adequately informed as to a litigant's contentions may the appellate court reverse on the basis of jury instructions to which there was no formal objection. Otherwise, litigants could rely upon ambiguous portions of a trial record in applying for a new trial, should the outcome of the first trial be unsatisfactory. Here, Van Heusen attempted strenuously to demonstrate to the trial court that the court could not remove the Boards from the case on the ground that no damage had been suffered—without giving Van Heusen the original litigating status of the Boards. The correct legal theory underlying Van Heusen's position was that of equitable subrogation. That the arguments of Van Heusen's counsel may not have articulated this theory with polished lucidity does not relieve the district court of its obligation to apply the correct law to the facts before it. As appears from our discussion of the argument on Fuqua's motions for directed verdict, Van Heusen's counsel did put forward before the trial court the very theory now being argued on appeal. To require as a prerequisite to Van Heusen's claim of error that its counsel should have continued to argue a position that the district court

apparently refused to accept would be to place an unnecessarily strict penalty on Van Heusen. As the court said in *Keen v. Overseas Tank Ship Corp.,* 2 Cir. 1952, 194 F.2d 515, 519, *cert. denied,* 343 U.S. 966, 72 S.Ct. 1061, 96 L.Ed. 1363, "[N]othing goes further to disturb the proper atmosphere of a trial than reiterated insistence upon a position which the judge has once considered and decided." [11]

As *Nowell* and other cases hold, even when there has been a failure to object to jury instructions in the trial court, an appellate court may reverse for plain error, to prevent a miscarriage of justice. *See* C. Wright & A. Miller, *supra,* § 2558, at 672 & nn. 40, 41. This Court has often found and based its decisions on plain error. *See, e. g., Wolfe v. Virusky,* 5 Cir. 1972, 470 F.2d 831, 835 n. 5; *Sheppard Federal Credit Union v. Palmar,* 5 Cir. 1969, 408 F.2d 1369; *Mondshine v. Short,* 5 Cir. 1952, 196 F.2d 606, 608; *Dowell v. Jowers,* 5 Cir. 1948, 166 F.2d 214, 221, *cert. denied,* 334 U.S. 832, 68 S.Ct. 1346, 92 L.Ed. 1759.[12]

Reference to some of the cases in which this Court reversed a trial court notwithstanding a failure to argue a point below persuades us that justice is best served here by granting Van Heusen a new trial. In *Wolfe* the trial court became confused as to the wording of a special interrogatory, which it had already delivered to the jury. Because of this confusion, the court's oral instructions would have required a "yes" answer in order to find the malpractice defendant guilty; the interrogatory ac-

---

**11.** *See also* F.R.Civ.P. 46:

> Formal exceptions to rulings or orders of the court are unnecessary; but for all purposes for which an exception has heretofore been necessary it is sufficient that a party, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and his grounds therefor . . . ..

It has been held by a number of courts that Rule 51's requirement of objections to jury instructions must be read in conjunction with Rule 46's abrogation of formal exceptions.

*See United States v. General Motors Corp.,* 3 Cir. 1955, 226 F.2d 745, 750; *Montgomery v. Virginia State Lines,* 1951, 89 U.S.App.D.C. 213, 191 F.2d 770, 772–74; *Williams v. Powers,* 6 Cir. 1943, 135 F.2d 153, 156.

**12.** *See also Hormel v. Helvering,* 1941, 312 U.S. 552, 557, 61 S.Ct. 719, 721, 85 L.Ed. 1037, 1041 (Black, J.) ("There may always be exceptional cases or particular circumstances which will prompt a reviewing or appellate court, where injustice might otherwise result, to consider questions of law which were neither pressed or passed upon by the court . . . below.")

tually posed, when answered "yes", would have absolved the defendant of liability. When the jury's verdict was "yes" but other parts of the verdict revealed the jury's confusion, the court orally restated the verdict: "We, the jury, find for the defendant." The jury agreed with the court and a judgment was entered accordingly. On appeal, this Court reversed because the inconsistency between the court's instructions to the jury and the wording of the special interrogatory materially prejudiced the plaintiff. Because the error was fundamental, this Court dispensed with the plaintiff's failure to object to the oral instruction and interrogatories in a footnote.

*Sheppard Federal Credit Union* was an action by a mortgagor for damages allegedly resulting from a mortgagee's wrongful repossession of security. Evidence in the jury trial was conflicting. This Court held that an instruction erroneously placing the burden of proof upon the mortgagee to establish the reasonableness of its conduct, because it could have affected the jury's verdict, required the grant of a new trial. We stated that

> For purposes of the plain error rule, justice is done when a person has received substantially everything to which he is entitled under the applicable law. . . . However, on the record before us, we cannot say that a correct charge would have made no substantial difference. Burden of proof is always of major importance and, in this case where the evidence was close on the question of good faith, it was crucial.

**13.** An alternate basis for our decision to reverse is, therefore, that upon the record before us the district court should have declared as a matter of law that Van Heusen was a third-party beneficiary of the March 29 contract. Although Fuqua protested throughout its pleadings and the pre-trial orders that Van Heusen lacked standing to sue, there is not one shred of evidence that Varco and the Boards did not intend in the legal sense to benefit Van Heusen. *See Mutual Benefit Health & Acc. Ass'n v. Bullard*, 1960, 270 Ala. 558, 120 So.2d 714, 723, where the court held

In this case, the error of the trial court was fundamental. By setting up an additional hurdle to a favorable jury verdict for Van Heusen, the instruction on third-party beneficiary status may well have deprived Van Heusen of its right to have the real issue, the issue of contract and damage, decided.

To be sure, we are of the opinion that there was no rational basis for the jury to have found against Van Heusen for lack of standing as a third-party beneficiary.[13] That Van Heusen and Varco had been engaged in constructing factory buildings for some time was not questioned during the trial. Moreover, Fuqua admitted that

> Before the time of execution of the March 29 . . . contract it was made known to Varco that it was the, or a, particular purpose of plaintiff board[s] to lease to plaintiff Van Heusen for use as a factory in the manufacture of shirts or parts of shirts, the building[s] whose construction was a subject of the said contract.

This admission was read to the jury, along with the response that "Fuqua admits the truth of [this] statement".

The possibility of prejudice, however, is so significant that it cannot be ignored. In the course of the jury's deliberations it sent the following message to the trial judge:

> The jury wishes to request your kindness in repeating to us the charges you made to the jury yesterday. Specifically the four major areas: third party beneficiary, breach of contract, etc. If possible, could we have a short written statement?

that it is the intention of the parties disclosed by their writings and by the surrounding circumstances, rather than their motives, which determines whether a party has the standing of a third-party beneficiary. *Cf. United States v. Mikelberg*, 5 Cir. 1975, 517 F.2d 246, 254 (even if question whether a transaction affected interstate commerce should have gone to jury, failure to instruct on issue was not reversible error, where the appellate court from undisputed evidence found that for the jury "to have found otherwise would be inconceivable").

▮ The court did not deliver additional instructions. The jury's request shows that it was concerned about all areas of the charge. It also shows that it felt that the third-party beneficiary status of Van Heusen was a "major area". If the jury had, in fact, been convinced that there was an intention to benefit Van Heusen in the March 29 contract, it is highly unlikely that it would have requested additional instructions with respect to the law of third-party beneficiaries. Instead, the jury would have focused on the other areas of law with which it was necessarily concerned. Once the jury demonstrates that it is concerned with an issue, it cannot be said that a clearly erroneous instruction was nonprejudicial.

▮ Our decision to reverse for a new trial because of the trial court's failure to find that Van Heusen was subrogated to the Boards' rights against Varco is supported by many cases, some from this circuit, which hold that a trial court has the ultimate responsibility to apply the law to the uncontested facts before it. *See Empire Life Ins. Co. v. Valdak Corp.,* 5 Cir. 1972, 468 F.2d 330, 334; *McCrea v. Harris County Houston Ship Channel Navigation Dist.,* 5 Cir. 1970, 423 F.2d 605, 610, *cert. denied,* 400 U.S. 927, 91 S.Ct. 189, 27 L.Ed.2d 186; *Schenfeld v. Norton Co.,* 10 Cir. 1968, 391 F.2d 420, 424–25; *Goldberg v. Sorvas,* 3 Cir. 1961, 294 F.2d 841; *Massachusetts Bonding & Ins. Co. v. New York,* 2 Cir. 1958, 259 F.2d 33; *Matarese v. Moore-McCormack Lines,* 2 Cir. 1946, 158 F.2d 631, 633; *Proctor & Gamble Co. v. Byers Transportation Co.,* W.D.Md. 1973, 355 F.Supp. 547, 561 n. 29 (alternate holding).[14]

In *Empire Life Ins. Co.,* the trial court had applied the Uniform Commercial Code in a Texas case even though at the time of the events giving rise to the lawsuit the Code was not then effective. This Court reversed for a new trial on another issue, but it suggested that it would have reversed for the failure to apply the correct law. We said that "appellate review does not consist of supine submission to erroneous legal concepts even though none of the parties declaimed the applicable law below". In *McCrea,* the Court remanded the question whether interest should be awarded as well as damages, although that question had not been decided by the district court. We recognized the general principle that "appellate courts will not consider issues raised for the first time on appeal", but we also noted that "[t]his principle is relaxed in cases where the question is one of law, and failure to hear it would result in a miscarriage of justice". 423 F.2d at 610 n. 19.

As the court in *Massachusetts Bonding and Ins. Co.* noted,

> Rule 54(c), F.R.Civ.P., points out, that it is the court's responsibility to award relief required by the facts on any proper ground, regardless of the theories urged by the parties.[15]

▮ Of course, Rule 54(c) does not abrogate the requirements of Rule 51 with respect to the litigant's obligation to object to jury instructions. Rule 54(c), however, does support the generally accepted notion that in certain circumstances Rule 51's requirements may be overlooked. These are circumstances in which the litigant's claim should, as a matter of law, have been recognized.[16]

---

14. *See also Troupe v. Chicago, D. & G. Bay Transit Co.,* 2 Cir. 1956, 234 F.2d 253, 261 (Frank, J., concurring):

> A litigant surely has the right to assume that a federal trial judge knows the elementary substantive legal rules, long established by precedents, and that therefore the judge will act accordingly, without prompting by the litigant's lawyer.

15. Rule 54(c) states that "every final judgment shall grant the relief to which the party in

whose favor it is rendered is entitled even if the party has not demanded such relief in his pleadings".

16. In a case decided before the adoption of the Federal Rules, *United States v. Atkinson,* 1936, 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557, the Court asserted that errors not "saved" by proper objection may nevertheless be reviewed on appeal when such errors are obvious or otherwise seriously affect the fairness and integrity of judicial proceedings.

Here, Van Heusen's claim was that it was subrogated to the Boards' position against Varco. The facts that gave rise to this right of subrogation were not only undisputed, but were put into evidence by the defendant Fuqua in the form of the indemnity agreements between Van Heusen and the Boards. As the district court found, "the proof clearly established that whatever sum was spent to perform repair work on the building was the money of Van Heusen and that Fort Payne [and Section were] completely indemnified by Van Heusen. . . ." The district court should have gone on from there to find that Van Heusen was therefore subrogated to the Boards' claims.

## THE OTHER COUNTS

Because of our decision that Van Heusen was entitled to subrogation, it is necessary to determine whether the trial court was correct in directing verdicts against the Boards on Counts IV and V.

### I

### THE CERTIFICATES

■ The appellants contend that where a contract is still executory, no consideration is necessary to support a modification of such a contract. The cases cited by the appellants support this contention. The appellees' brief does not contest this point. See *Commercial Contractors, Inc. v. United States Fidelity & Guaranty Co.*, 5 Cir. 1975, 524 F.2d 944; *Young v. United States, for Use of Brown*, 5 Cir. 1964, 327 F.2d 933, 935–36; *Spry v. Pruitt*, 1951, 256 Ala. 341, 346, 54 So.2d 701, 705–06; *Adalex Constr. Co. v. Atkins*, 1925, 214 Ala. 53, 106 So. 338, 340; *Moore v. Williamson*, 1925, 213 Ala. 274, 104 So. 645, 649; *Wilson v. Windham*, 1925, 213 Ala. 31, 104 So. 232, 233 (dictum).[17]

Before discussing the contentions of the parties with respect to the "certificates", we set forth, in pertinent part, the letter from Varco's president to Van Heusen, dated November 16, 1965.

I found the steel work to be in good condition in all respects except for a few very minor adjustments that need to be corrected. These adjustments will amount to about three days work for three men and have already been brought to the attention of the erector, Rock Steel Building Company. I am advised by Mr. Leland Jones that these items will be taken care of in the next seven days.

Other than these few minor items mentioned above, the steel frame was erected according to A.I.S.C. specifications and is in good shape in all respects.

With the previous certification that we have given you on the design of the steel and this certification upon the erection, I do not hesitate to certify these buildings to be good for the required loads as designed.

Fuqua contends now that the Boards could have acquired no rights based upon this or any letter addressed to Van Heusen. Fuqua also contends that because Varco was already obligated to design the steel, the certification that the buildings were "good for the required loads as designed" added no new obligations and that Van Heusen waived any contentions it had, for failure of proof, that Varco by this letter accepted responsibilities primarily residing in Van Heusen's architect, Holman.

Van Heusen argues first, that there were plans and drawings in evidence that the jury could have believed constituted the basis for the contract. These specified that the "roof structural system shall safely support a combination

---

17. The recent Alabama case of *Mobile Turnkey Housing Inc. v. Commercial Contractors, Inc.*, 1975, 294 Ala. 707, 321 So.2d 186, and the sources relied upon in that case, are distinguishable from this case. In *Mobile Turnkey*, the contracting party was in breach of its contract at the time of the modification. The coercive tactics which led to such modifications

should obviously not be rewarded by subsequent enforcement of the new agreement. Where, however, the promisee had not breached or threatened breach at the time of the modification, the usual rule—that no consideration is necessary for modification—should be applied.

live plus dead load of 40 P.S.F. plus a 20 P.S.F. wind load". Second, the jury could also have found that the contract provision requiring the manufacturer to submit shop drawings detailing the stress analysis of frames, purlins, and other details, was waived on the condition that Varco accept the responsibility for the design of the steel. Van Heusen points to the fact that this waiver and condition are evidenced by the letter from Varco to Van Heusen.

■ Fuqua's contention that the letters addressed to Van Heusen could not have given the Boards additional rights is untenable. There was testimony at trial that Howard, Chairman of the Fort Payne Board, had conferred with Varco with reference to certifying and guaranteeing that the steel was sufficient. The jury might have believed, therefore, that although the letter was addressed to Van Heusen, it was intended to placate the concern of the Fort Payne Board as well as the concern of Van Heusen. The case cited by Fuqua which bests supports its legal theory, *Mogul Wagon Co. v. Shotts*, 1922, 18 Ala.App. 528, 93 So. 219, stands merely for the proposition that a contract cannot be modified by an agent of one party without authority to modify such a contract. There can be no contention here that Hatcher, the president of Varco, lacked authority to modify the obligations of Varco. That the means by which this modification came to the attention of the actual party to the contract was by way of another party whose interests were closely allied with it is irrelevant.

■ Fuqua's argument that the certification could not have increased the manufacturer's liability is also without merit. The jury could have found that the letter constituted a warranty that the buildings were in fact designed to carry the required loads.

■ Finally, Fuqua's contention that there was a failure of proof that Varco had accepted any responsibilities for the design of the steel which originally rested with Holman lacks substance. There

was testimony that Holman had admitted to Howard that he had not designed the steel and had instead accepted the design of Varco upon Varco's assurance that the steel design was sufficient. The letter of Varco could reasonably have been believed to corroborate this testimony. When, during the course of the arguments on the motions for directed verdict, counsel for Van Heusen sought to "amend the pleadings to conform to the proof", this did not, as Fuqua suggests, waive Van Heusen's theory that Varco had indeed underwritten Holman's responsibility for the steel design. The issue at that argument was not whether Varco had or had not underwritten Holman's responsibilities, but whether there was consideration for the alleged warranty contained in Varco's letter. The district court felt that, because at the time the letter was written the contract had already been violated with respect to Varco's giving Holman the specifications and Holman's accepting them, the release of Varco's responsibility for submitting those specifications could not have constituted consideration. Van Heusen's counsel, in amending the pleadings, attempted to include as the basis for consideration the ultimate acceptance of the factories. He was not admitting that if no consideration were legally necessary, as we hold, the letter did not demonstrate that Varco had accepted responsibilities of Van Heusen's agent, Holman.

We hold that Van Heusen is subrogated to the Boards' position. It is unnecessary, therefore, to speculate whether Van Heusen could have acquired any rights under the alleged warranty in the absence ·of subrogation. We hold only that under the standard enunciated in *Boeing Co. v. Shipman,* 5 Cir. 1969, 411 F.2d 365, there is "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach" a verdict for the plaintiff Van Heusen on Count IV. *Id.* at 374. "It is the function of the jury as the traditional finder of the facts, and not the Court, to weigh conflicting evi-

dence and inferences . . . ." *Id.* at 375.

## II

## THE ACTION IN FRAUD

 Count V of the original complaint asserts that Varco "wilfully deceived the plaintiffs . . . with the intention of inducing them to alter their position to their injury or risk . . . within the legal meaning of Sections 111 and 112 of the Code of Alabama". The district court directed a verdict against the plaintiffs on this count on the grounds that the claim was barred by the applicable statute of limitations and that there was no evidence from which a jury could conclude that there had been any intent on Varco's part to deceive or defraud the Boards and Van Heusen. Our responsibility on this appeal is to determine whether the standards of *Boeing* for the direction of a verdict were met.

Here, the Boeing standard was violated by the directed verdict. The following aspects of the evidence might have convinced a reasonable and fair-minded jury that Varco had no intention on March 29 of complying with its alleged contractual obligations. (1) There is much evidence from which the jury could have believed that the contract was violated in many instances. The testimony of Morgan, Van Heusen's remedial architect, details many instances in which the contract work was not properly executed. (2) There is evidence from which the jury could have believed that, although contract specifications called for a structural system which would support a 40 pound load, the structural system was designed to support a load of only 38.3 pounds. (3) A letter from Hatcher to one of the subcontractors demonstrates that he believed in November 1965 that the condition of some of the steel purlins in the Fort Payne factory might, in some circumstances, give rise to a failure of the structure. On the day after this letter was sent, the letter of November 16, previously discussed with respect to Count IV, was sent to Van Heusen. The letter did not indicate in any sense that the "minor" problems which Hatcher had found could have resulted in a "failure". From these two letters the jury could reasonably have concluded that, at least in November, Hatcher was attempting to hide from Van Heusen the possible seriousness of the problem of the twisted purlins. (4) The jury could have concluded, from Hatcher's testimony to the effect that the subcontractor, not Varco, was responsible for the design of the steel, that Varco had no intention of meeting its alleged contractual obligations. It is not, however, for this Court or for the district court to decide the issue; it is for the jury.

The applicable Alabama statutes [18] require that the action be brought within one year after the fraud was discovered or should reasonably have been discovered. There is no serious contention that each alleged contractual violation could not have been discovered more than a year before the action was brought. Such alleged violations as failure to weld properly could undoubtedly have been discovered in 1965 in the same manner in which they were discovered in 1970. The directed verdict on Count V was then correct insofar as such violations caused damage. The main alleged violation, however, was that the design of the factories was inadequate to support a 40 pound load. The result of the alleged design failure, the twisting of the purlins, was obvious in 1965 (more than one year before the action was brought). The district court held, therefore, that

18. Code of Alabama, Tit. 7, §§ 26, 42 (1958). Although the plaintiffs originally asserted that the correct statute of limitations period was greater than one year because the alleged fraud originated from a contractual relationship, the district court rejected this viewpoint. *See* Pretrial Order of November 18, 1971, Appendix at 34. As the appellants did not argue the issue in their briefs, we assume that the district court's conclusion is conceded to be correct.

the statute of limitations barred the assertion of fraud with respect to design.[19]

In *James Talcott, Inc. v. Jack Cole Co.,* 5 Cir. 1971, 441 F.2d 325, we dealt with the correctness of a directed verdict on a misrepresentation claim under another Alabama statute. We noted that our decision to reverse and direct a trial verdict was prompted by the Seventh Amendment mandate to preserve the right of trial by jury in suits at common law. *Id.* at 327. We found that a jury question had been presented as to whether the plaintiff knew, or in the exercise of reasonable care should have known, for more than the limitation period of one year that certain misrepresentations had been made. The evidence showed that the conveyor system that the defendants had sold to the plaintiffs had malfunctioned since its installation, and that suit was brought on the misrepresentation ground more than a year after such malfunctions were discovered. It was the plaintiff's contention, however, that the defendant's continued efforts to repair the system, ending less than a year before this suit was brought, tolled the statute of limitations. The district judge, in directing a verdict against the plaintiff, was impressed by the long delay between the sending of the final check for the system to the defendant and the bringing of the lawsuit. Although we recognized that the question was close and that strong arguments had been presented on behalf of the defendant, we concluded that the question was for the jury.

Here, too, there was evidence from which the jury could have concluded that Van Heusen reasonably could not have known about the design failure until one year within the time the action had been brought. Testimony indicated that the remedial architect, Morgan, attempted from some time during 1970 to obtain the original calculations in which Varco had determined that the steel design was sufficient. The jury could have believed that it was not until late in that year that the architect discovered that the calculations upon which Varco appeared to be relying were erroneous. The case must be viewed in light of the 1965 certification which assured Van Heusen and the Boards that, despite the twisted condition of some purlins, the steel structure was sufficient. The evidence provided a basis for a rational and fair-minded jury to conclude that Van Heusen was not barred by the statute of limitations. *Boeing Co. v. Shipman; James Talcott, Inc. v. Jack Cole Co.; Loch Ridge Constr. Co. v. Barra,* 1973, 291 Ala. 312, 280 So.2d 745.

In conclusion, we affirm the judgment of the district court with respect to the Boards. We reverse the judgment of the district court with respect to Van Heusen and remand for a new trial, except that we affirm the directed verdict on Count V insofar as the action for fraud is based on contractual violations other than the alleged failure of the steel design.

19. *See, e. g., Moss v. Davitt,* 1951, 255 Ala. 513, 52 So.2d 515, 518–19, *quoting Butler v. Guaranty Savings & Loan Ass'n,* 1948, 251 Ala. 449, 37 So.2d 638, 639 ("Facts which provoke inquiry in the mind of a man of reasonable prudence, and which, if followed up, would have led to a discovery of the fraud, constitute sufficient evidence of discovery.").