These appeals and cross-appeals arise from a summary judgment entered in a consolidated action. We affirm the judgment.
In July 1975, Farmers Merchants Bank of Centre (the "Bank") purchased an insurance policy from The Johnson Agency (the "Agency") — the insurance agency with which the Bank transacted all of its insurance business. This new policy was secured on the request of a vice president of the Bank to protect against monetary losses resulting from thenegligence of the Bank's officers or directors.[1]
The Bank's president and board of directors approved the purchase of the new insurance policy. Robert L. Griffith, president of the Agency, prepared the policy application to obtain the insurance from Home Insurance Company ("Home"), and later delivered the executed policy to the Bank.
The Home policy, issued to the Bank through the Agency, consisted of two parts styled "DIRECTORS AND OFFICERS LIABILITY" and "COMPANY REIMBURSEMENT *Page 827 
LIABILITY" — a standard policy form. The first section provided coverage for Bank directors and officers (reimbursement to the directors and officers directly) under circumstances in which the Bank was not required or permitted to indemnify its directors and officers for losses incurred by them while acting in their capacities as officers and directors.[2] The second section provided coverage for losses sustained by the Bank (reimbursement to the Bank) because of the Bank's indemnifying its officers and directors under circumstances in which the Bank was required or permitted to indemnify.[3] The policy was renewed every three years, the latest renewal being made for the period of July 17, 1981, through July 17, 1984.
No claims were made against Home under the policy until January 1983, when a lawsuit was filed against the Bank and one of its officers, alleging fraudulent and dishonest practices. By letter, dated January 21, 1983, Home's lawyer advised Griffith and the Agency of Home's position regarding the lawsuit:
 "Further, the complaint is primarily directed against the corporate defendant, the Farmers and Merchants Bank. Under the Policy, the Bank is only an insured to the extent that it may indemnify *Page 828 
its directors and officers for covered loss incurred by them. Since the acts alleged in the complaint could not lead to covered loss, there can be no such derivative coverage under the Policy as to the Bank."
Griffith stated that he told the Bank's president of Home's notification of denial of coverage and that he forwarded a copy of Home's letter to the Bank.
In September 1983, the Bank's president notified Griffith of another lawsuit against the Bank and certain of its directors and officers and requested that Homedefend the Bank and the officers and directors. Again, by letter to Griffith and the Agency dated September 29, 1983, Home's lawyer set out Home's position:
 "Please also inform the Bank that it is not an insured under the Policy, except to the extent that it may indemnify its directors and officers for covered loss incurred by them. In all other respects, the Policy does not cover the Bank, and does not provide for payment of the Bank's legal expenses or for providing a defense for the Bank.
". . . .
 "The Bank is not an insured under the Policy, except to the extent that it may indemnify its directors and officers. Accordingly, to the extent that the complaint asserts claims against the Bank, they would not be covered. Similarly, costs of defense incurred by the Bank would not be covered."
In response to this letter, the Bank's president requested that Griffith advise another insurer of this second lawsuit so that the other insurer could act to protect the Bank under the Bank's blanket bond.
In November 1983, the Bank's president told Griffith of counterclaims filed against the Bank and certain directors and officers in a third lawsuit. Again, the Bank requested that Home provide the Bank and its directors and officers with a defense in the case. The response of Home's lawyer to this claim against the policy was dated November 3, 1983, and it stated:
 "As I requested in our telephone conversation of November 10, 1983, please immediately inform the Bank and the directors and officers (the 'Insureds') that the coverage provided by the Policy does not include assumption by Home of the defense of claims made against the Insureds. Rather, under the Policy the Insureds are to prepare and present their own defense, and seek reimbursement for the costs reasonably incurred in defending claims which fall within the coverage of the Policy.
 "Please also inform the Bank that it is not an insured under the Policy, except to the extent that it may indemnify its directors and officers for covered loss incurred by them. In all other respects, the Policy does not cover the Bank, and does not provide for payment of the Bank's legal expenses or for providing a defense for the Bank."
Following Home's third letter denying coverage, the Bank (in the Cherokee Circuit Court) filed a declaratory judgment action styled Farmers Merchants Bank v. The JohnsonAgency, Inc., and Robert L. Griffith ("F M v.Agency"), asking the trial court to find the defendants liable for losses in excess of $7 million allegedly suffered by the Bank because of the negligent acts of the Bank's directors and officers. The Bank alleged both breach of contract and fraud against the defendants, basing its claims on the Home policy sold to the Bank by Griffith.
In a separate action styled Farmers Merchants Bank v.The Home Insurance Company, The Johnson Agency, Inc., andRobert L. Griffith ("F M v. Home"), the Bank sought declaratory relief to the effect 1) that Home was obligated to defend the Bank and certain of its directors and officers in the two actions against the Bank and its directors and officers and in the third action against the Bank alone; and 2) that Home was obligated to pay, on behalf of the Bank and its directors and officers, any losses suffered in connection with those actions. The Bank also alleged that Home had breached the contract of insurance and had committed the tort of bad faith failure to perform its obligations under the insurance contract. *Page 829 
The defendants filed motions to dismiss, along with supporting affidavits. The trial court treated the actions as consolidated and treated the defendants' motions as motions for summary judgment. After the motions had been briefed and argued, the trial court granted summary judgment in favor of the defendants on the Bank's claims of breach of contract and denied the defendants' motions for summary judgment as to the Bank's misrepresentation claim in F M v. Agency.
In F M v. Home, the court granted summary judgment in favor of Home as to the Bank's breach of contract claim as it related to Home's duty to defend the pending suits against the Bank, as well as the claims against the Bank's officers and directors; however, the trial court denied the defendants' motions to the extent that the Bank claimed coverage for reimbursement of the officers and directors, stating that "Home has not denied coverage for such indemnification but has reserved its rights until the respective lawsuits are concluded." The trial court denied the defendants' summary judgment motions as to the Bank's claims against Home for bad faith and fraud.
The defendants filed motions for reconsideration of the trial court's order and in support of their motions filed the affidavit of Griffith. The trial court reconsidered its order and granted summary judgment in favor of the defendants on the fraud and bad faith claims on the ground that these claims were barred by the statute of limitations. The trial court held that "the series of notices [the letters from Home's lawyer] to the Bank . . . stated Home's position as to coverage in a clear and unquestionable fashion and constituted as a matter of law a discovery by the Bank of the alleged fraud which commenced the running of the statute of limitations." The Bank appealed; Home, Agency, and Griffith cross-appealed.
On appeal, the Bank advances alternative arguments in contract and in tort. It first maintains that the contract of insurance provides direct coverage to the Bank for the losses made the basis of the Bank's claims under the policy. We find, however, as did the trial court, that the Bank is not the insured under the provisions of the first insuring clause and, therefore, may not bring a direct action against Home under this clause. Rather, the plain terms of this first insuring clause provide direct coverage only to the officers and directors. The Bank, then, in order to recover the losses it sustained as a result of the officers' and directors' negligence, must pursue its claim directly against these officers and directors.
The second insuring clause very plainly provides primary insurance coverage to the Bank to the extent the Bank has indemnified its officers and directors for covered losses incurred by those officers and directors. We agree with the trial court that the second insuring clause has no application to the instant cases, where there has been no claim of indemnification by the Bank.
In further support of its contract claim, the Bank alleges that certain terms of the insurance policy are ambiguous; therefore, it argues, the contract must be construed against Home and must be interpreted as providing direct insurance coverage to the Bank. We disagree.
The Bank finds support for its claim of ambiguity in our recent decision in Davis v. Southern United Life Ins.Co., 494 So.2d 48 (Ala. 1986). In Davis, we reversed a summary judgment for the insurance company when we found that "the meaning of the term 'may' could be considered unclear," thereby rendering the insurance provision ambiguous and presenting a question for consideration by a jury. We find, however, no lack of clarity in the Home insurance contract purchased by the Bank.
The Home policy is not confusing with regard to the meaning of its terms nor with regard to the construction of the policy as a whole. The policy is explicit in describing thetype of insurance coverage provided ("Directors and Officers Liability" and "Company Reimbursement" liability), in naming the insureds under the policy, in specifying the "Wrongful Acts" insured against, and in setting out the requisites *Page 830 
for making a claim and collecting against the policy. The trial court, then, correctly found for Home on this issue and that finding required that the unambiguous policy be enforced in accordance with its terms. See Kinnon v. UniversalUnderwriters Ins. Co., 418 So.2d 887 (Ala. 1982), and cases cited therein.
Additionally, the allegedly ambiguous language ("legally obligated to pay" and "loss") relates to theinsureds under the first insuring clause of the policy, i.e., the officers and directors. Therefore, in its attempt to collect under a policy provision that requires that the insureds be "legally obligated to pay" for their wrongdoings, the Bank — not an insured
under this clause — may not assert the liability of the officers and directors, who are not parties to this action.
Finally, the Bank argues that even if the written
language of the policy did not provide direct coverage to the Bank, Home is nevertheless bound to provide the coverage that the Bank reasonably expected as a result of the representations of Home's agent. The Bank's vice president, who was responsible for initiating the purchase of this policy, claimed that he told Griffith that the Bank needed a directors and officers liability policy 1) to provide the Bank with insurance protection against losses to the Bank resulting from the negligent or improper handling of Bank business by directors or officers; 2) to protect the Bank against losses due to the Bank's indemnifying its directors and officers; and 3) to protect the Bank's officers and directors against losses due to class action and derivative suits by stockholders. Graves also stated that Griffith assured him that the policy would cover the Bank's own losses.
Therefore, says the Bank, relying on Protective LifeIns. Co. v. Atkins, 389 So.2d 117 (Ala. 1980), these representations made by Griffith, even though contrary to the written terms of the contract, are binding on Home in light of Griffith's status as an authorized agent for the sale of Home policies. Although this argument is based upon a correct understanding of the holding in Atkins, the facts of that case are clearly distinguishable from the instant facts.
In Atkins, the plaintiffs sued to recover the proceeds of a Protective Life Insurance Company "credit life" policy that had been issued on the life of the plaintiffs' testator in conjunction with a home mortgage loan. The testator's son took the final mortgage payment to the bank, where he talked with a bank vice president who was also an authorized Protective Life agent. The vice president told the testator's son that the testator could keep the life insurance in effect for the rest of that year or could cancel it and receive a refund of any prepaid unearned premiums. The testator did not return the policy for a refund, and he died several weeks later.
Protective Life denied coverage under the policy and returned the prepaid premiums because the written policy language provided 1) that coverage terminated on the date the mortgage loan was paid in full, and 2) that the policy could not be modified without the consent of Protective Life's president, vice president, or secretary.
The bank vice president/Protective Life agent who talked with the testator's son testified that although his authority as a Protective Life agent was limited, he believed his representations to the testator's son were true. He also stated, however, that he had had no conversation with the testator's son regarding his authority. The testator's son claimed that he was under the impression that the bank vice president had the authority to bind Protective Life.
The holding in Atkins centered on the relationship of the parties (including the bank vice president) and on the authority of the bank vice president to change the provisions of an existing contract of insurance. The Court also addressed the issue of the oral extension of anexisting written policy. The doctrine of merger was not applicable.
Here, however, the written policy of insurance was issuedsubsequent to the agent's allegedly making oral representations that were contrary to the provisions of the written insurance contract. The instant facts, therefore,do invoke the application of the doctrine of merger, thereby *Page 831 
precluding any consideration of the alleged prior representations of Griffith as to coverage. We find the following language from Hartford Fire Insurance Co. v.Shapiro, 270 Ala. 149, 117 So.2d 348 (1960), to be instructive on this issue:
 "It is familiar law that a contract of insurance is essentially like all other contracts, and governed by general rules of contract. . . .
 "Where there exists between the parties a written contract, the authorities are in agreement that parol evidence cannot be received to explain, contradict, vary, add to or take from its terms. . . . The statement of this rule employed in insurance cases, is that all parol negotiations, understandings, and agreements are merged into the written policy. . . .
". . . .
 ". . . . The majority of American courts hold that if the policy is accepted by the insured, he is bound thereby, even though the policy does not correspond to the preliminary negotiations. . . .
 "This same rule would seem to obtain in Alabama, since our precedents provide that an insured is presumed to be familiar with the provisions of his policy. . . ." 270 Ala. at 153-55, 117 So.2d at 352-54.
The holding in Shapiro is especially applicable where, as here, the contract of insurance is between sophisticated parties. We find no error in the trial court's ruling on the Bank's contract issue; therefore, we turn now to the Bank's alternative argument with regard to its claims in tort.
The Bank's tort claims arise from its allegations of misrepresentation of the policy's terms and a bad faith failure to pay claims made against the policy. The Bank also maintains that its tort claims are not barred by the statute of limitations and that the trial court erred in reversing its judgment on these claims on the defendants' motions for reconsideration.
We need not address the merits of misrepresentation and bad faith issues. We find, as did the trial court, that these claims were barred by the applicable statute of limitations. Code 1975, § 6-2-39(a)(5) and § 6-2-3.[4]
The Bank strenuously argues that the post-claim letters from Home's lawyer denying coverage can not be the basis for finding that the Bank had notice of the alleged tortious conduct of the defendants, and thus that the statute of limitations period had begun to run. A denial of coverage in the instant circumstances, says the Bank, was an expected occurrence; therefore, it says, the letters from Home's lawyers only conditionally denied direct coverage to the Bank and were not to put the Bank on notice of a discrepancy between the allegedly represented coverage and the coverage defined by the terms of the policy or to trigger the running of the statute of limitations. In any case, the Bank argues, where, as here, there is evidence from which reasonable inferences may be drawn as to whether a plaintiff has been defrauded and, if so, when the plaintiff discovered the fraud, the statute of limitations issue is to be determined by the trier of fact and is not properly determined on a motion for summary judgment. MarksFitzgerald Furniture Co. v. Clarklift of Alabama, Inc.,494 So.2d 614 (Ala. 1986).
We do not argue with the Bank's statement of the law with regard to the relationship between the discovery of fraud and the commencement of the running of the statute of limitations for an action in fraud. We would point out, however, that the running of the statute of limitations may be triggered when the party seeking to bring the action knew of facts which would put a reasonable mind on notice of the possibleexistence of fraud. Jefferson County Truck GrowersAss'n v. Tanner, 341 So.2d 485 (Ala. 1977). This is also the standard by which to determine when a cause of action for bad faith refusal to pay insurance benefits accrued for the purposes *Page 832 
of commencing the running of the statute of limitations. SeeSafeco Ins. Co. of America v. Sims, 435 So.2d 1219
(Ala. 1983); Dumas v. Southern Guaranty Ins. Co.,408 So.2d 86 (Ala. 1981).
Here, the trial court, in its order on reconsideration, held:
 "On the basis of the foregoing notices to the Bank, the court finds that the Bank was charged with knowledge of the alleged misrepresentation in January 1983, when it first received the letter from Home's attorney denying the coverage claimed by the Bank and describing the coverage which Home intended to provide — such coverage being inconsistent with the coverage which Griffith allegedly represented at the time the policy was issued. The series of notices to the Bank . . . stated Home's position as to coverage in a clear and unquestionable fashion and constituted as a matter of law a discovery by the Bank of the alleged fraud which commenced the running of the statute of limitations." (Emphasis supplied.)
We recognize, of course, that, where contrary inferences may be drawn by the factfinder as to the date on which the plaintiff was put on reasonable inquiry of the alleged misrepresentation, this factual issue precludes disposition by summary judgment. See Marks Fitzgerald Furniture Co.v. Clarklift of Alabama, Inc., supra; Elrod v. Ford,489 So.2d 534 (Ala. 1986); Cartwright v. Braly, 218 Ala. 49,117 So. 477 (1928); Cumberland Capital Corp. v.Robinette, 57 Ala. App. 697, 331 So.2d 709 (1976);James Talcott, Inc. v. Jack Cole Co., 441 F.2d 325
(5th Cir. 1971).
Nonetheless, here, we agree with the trial court. We find that the letters written by Home's lawyer could not have been more explicit in setting out the type of coverage provided the Bank by the Home policy and in explaining what kinds of claims would be honored and what kinds would not be honored by Home. This evidence showed, without conflict, that, at the very least, the Bank had notice of "facts sufficient to put a prudent person on inquiry, which in the exercise of proper prudence and diligence would have enabled" the Bank to learn of the alleged tortious conduct on the part of the defendants. Sexton v. Liberty Nat'l Life Ins. Co.,405 So.2d 18 (Ala. 1981), quoting from Seybold v.Magnolia Land Co., 376 So.2d 1083 (Ala. 1979). Therefore, summary judgment on the claims of misrepresentation and bad faith was proper.
Because of our holding with regard to the issues raised on the appeals, the issues on the cross-appeals are mooted. The judgment is therefore affirmed.
AFFIRMED.
ALMON, SHORES, HOUSTON and STEAGALL, JJ., concur.
[1] Dishonest acts of the Bank's officers and directors were covered under a separate broker's bond.
[2] The insuring clause of the "Directors and Officers Liability" section of the policy provides:
 "If during the policy period any claim or claims are made against the Insureds (as hereinafter defined) or any of them for a Wrongful Act (as hereinafter defined) while acting in their individual or collective capacities as Directors or Officers, the Insurer will pay on behalf of the Insureds or any of them, their Executors, Administrators or Assigns 95% of all Loss (as hereinafter defined), which the Insureds or any of them shall become legally obligated to pay. . . ."
The term "Insureds" in the above-quoted provision is defined as follows:
 "The term 'Insureds' shall mean all persons who were, now are or shall be duly elected Directors or Officers of the [Bank]. . . ."
The term "Wrongful Act" in the above-quoted provision is defined as follows:
 "The term 'Wrongful Act' shall mean any actual or alleged misstatement or misleading statement or act or omission or neglect or breach of duty by the Insureds while acting in their individual or collective capacities or any matter, not excluded by the terms and conditions of this policy, claimed against them solely by reason of their being Directors or Officers of the [Bank]."
The term "Loss" in the above-quoted provision is defined as follows:
 "The term 'Loss' shall mean any amount which the Insureds are legally obligated to pay for a claim or claims made against them for Wrongful Acts and shall include but not be limited to damages, judgments, settlements and costs, cost of investigation (excluding salaries of officers or employees of the [Bank]) and defense of legal actions, claims or proceedings and appeals therefrom, cost of attachment or similar bonds; providing always, however, such subject of loss shall not include fines or penalties imposed by law or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed."
[3] The insuring clause of the "Company Reimbursement Liability" section of the policy provides:
 "If during the policy period any claim or claims are made against the Directors or Officers (as hereinafter defined) or any of them for a Wrongful Act (as hereinafter defined) while acting in their individual or collective capacities as Directors or Officers, the Insurer will pay on behalf of the [Bank] 95% of all Loss (as hereinafter defined), which the [Bank] may be required or permitted to pay as indemnities due to the Directors or Officers for a claim or claims made against them for Wrongful Acts. . . ."
The definition of "Directors and Officers" in the above-quoted section of the policy is the same language used to define "Insureds" in the insuring clause of the "Directors and Officers Liability" section of the policy. The definition of "Wrongful Act" in the above-quoted section of the policy is the same language used to define that term in the insuring clause of the "Directors and Officers Liability" section of the policy.
The term "Loss" in the above-quoted section of the policy is defined as follows:
 "The term 'Loss' shall mean any amount which the [Bank] may be required or permitted to pay as indemnities due the Directors or Officers for a claim or claims made against them for Wrongful Acts and shall include but not be limited to damages, judgments, settlements and costs, cost of investigation (excluding salaries of officers or employees of the [Bank]) and defense of legal actions, claims or proceedings and appeals therefrom, cost of attachment or similar bonds, for which payment by the [Bank] may be required or permitted according to applicable law, or under provisions of the [Bank's] Charter or By-Laws; providing always, however, such subject of loss shall not include fines or penalties imposed by law or matters which may be deemed uninsurable under the law pursuant to which this policy shall be construed."
[4] We recognize that recent amendments to our statutes of limitations extended the statutory period to two years effective January 9, 1985. See Act 85-39, Second Spec. Session, 1984-85 Ala. Acts, repealing § 6-2-39, and amending § 6-2-38 and § 6-2-3. Those amendments have no effect in this case.